763 A.2d 209

Frank SAMUELS

v.

James D. TSCHECHTELIN et al.

No. 2044, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Oct. 13, 2000.

Reconsideration Denied Dec. 26, 2000.

484

486

488

490

492

494

Mark S. Dachille (Barry L. Steelman, on the brief), Baltimore, for appellant.

Jacqueline W. Mintz, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Mark J. Davis, Asst. Atty. Gen., on the brief), Baltimore, for appellees.

Argued before HOLLANDER, SALMON and KRAUSER, JJ.

HOLLANDER, Judge.

This matter, which is before the Court for the second time, has its genesis in the 1995 termination of Dr. Frank Samuels, appellant, from the position of Vice President of Academic Affairs for Baltimore City Community College ("BCCC" or the "College"). Pursuant to Md.Code (1978, 1999 Repl.Vol.), § 16–503(b) of the Education Article ("E.A."), BCCC "is an institution of higher education of the State of Maryland."[1]

In 1996, appellant filed a multi-count complaint in the Circuit Court for Baltimore City against Dr. James D. Tschechtelin, President of BCCC; the Board of Trustees of the College (the "Board"); the individual members of the Board (the "Trustees");[2] and the State of Maryland, appellees herein. As to all appellees, jointly and severally, Samuels challenged his termination, alleging breach of his employment contract (Count I); breach of the implied covenant of good faith and fair dealing (Count II); denial of procedural due process under the Fourteenth Amendment to the United States Constitution and the Maryland Declaration of Rights (Count III); denial of substantive due process under the Fourteenth Amendment to the federal Constitution and the Maryland Declaration of Rights (Count IV); defamation (Count V); racial discrimination, in violation of 42 U.S.C. § 1981 (Count VI); and racial discrimination, in violation of 42

---

1. BCCC was formerly known as the New Community College of Baltimore. *See* E.A. § 16–503. See *Gardiner v. Tschechtelin,* 765 F.Supp. 279, 281–82 (D.Md.1991), for a discussion of the history of BCCC.

2. In our discussion, we shall use the term "Board" to refer collectively to the trustees as the governing body of the College, *see* E.A. § 16–504(a), and we shall use the term "Trustees" to refer collectively to the individual members of the Board.

U.S.C. § 1983 (Count VII). Over a three-year period, the circuit court disposed of the entire complaint through dismissal and summary judgment.

On appeal, Dr. Samuels does not challenge the court's ruling in appellees' favor as to Count VI. Moreover, with respect to the other counts, appellant disputes the lower court's rulings only as to certain appellees. Dr. Samuels presents four questions for our review, which we have rephrased and reordered:

I. Did the circuit court err in dismissing Counts III and IV as against Dr. Tschechtelin and the Trustees under the Maryland Declaration of Rights?

II. As to Counts I and II, did the circuit court err in granting summary judgment in favor of all appellees with respect to the claims for breach of contract and breach of the implied covenant of good faith and fair dealing?

III. Did the circuit court err in granting summary judgment in favor of Dr. Tschechtelin as to the defamation claim asserted in Count V?

IV. With respect to Count VII, did the circuit court err in granting summary judgment in favor of Dr. Tschechtelin and the Trustees as to the alleged violation of 42 U.S.C. § 1983?

For the reasons that follow, we shall affirm in part, vacate in part, and remand for further proceedings.

## I. FACTUAL BACKGROUND

### A. Motion to Dismiss[3]

Dr. Samuels, who is African–American, earned his Ph.D. in Sociology in 1970. Prior to joining the BCCC administration, Dr. Samuels held various administrative positions with the Wayne County Community College in Detroit, Michigan and

---

**3.** In this section, we have limited our summary to those facts alleged in the complaint and the exhibits attached thereto.

the Milwaukee Area Technology College in Wisconsin. In 1991, Dr. Samuels was appointed Vice President of Academic Affairs for the College. The appointment was evidenced by a Letter of Appointment dated October 29, 1991, from Dr. Tschechtelin to Dr. Samuels. It was signed and dated by Dr. Samuels on November 3, 1991, and approved by the Board on or about November 20, 1991. Attached as an exhibit to the complaint, the Letter of Appointment stated, in pertinent part:

I am pleased to offer you an appointment as Vice President of Academic Affairs. I am confident that you will contribute significantly to our goal of building a model urban community college.

Your appointment, which is subject to approval by the Board of Trustees on November 20, 1991, will begin on February 3, 1992.... This appointment is subject to the policies and procedures of the Board of Trustees of the New Community College of Baltimore, including those governing the terms and conditions of employment for administrators and professional staff and the Maryland State Department of Personnel.

Please indicate your acceptance of this appointment by signing in the space provided below and returning this letter (original copy) to the Human Resources Office within five days. You should retain the copy for your files.

Dr. Samuels contends that he also entered into a written employment contract with the Board (the "Employment Contract") in the Fall of 1991. The last page of the Employment Contract stated, in typed text: "Approved by Board of Trustees 3/20/91." An unsigned copy of the Employment Contract, dated November 21, 1991, was attached as an exhibit to the complaint.[4] It provided that the appointment was "subject to the authority of the Board of Trustees and the President and

4. At his deposition, Dr. Samuels explained that he had received two copies of the Employment Contract, signed and returned one, kept the other for his records, but never received a signed copy. Appellees disputed the validity of the Employment Contract, arguing, *inter alia*, that because the Employment Contract was not executed by an agent of the State, there is no agreement enforceable against the State.

the policies and procedures of the College as they may be established, modified or amended from time to time." Without further elaboration, appellant alleged that the Employment Contract was renewed for the 1993/1994 and 1994/1995 terms.

Referring to Dr. Samuels as the "Administrator/Professional Staff Member," the Employment Contract further provided, in part:

2. *Term:*

Unless otherwise terminated in accordance with the policies and procedures of the College, the term of this agreement shall commence on February 3, 1992, and terminate on February 2, 1993.

3. *Notice:*

The President shall give written notice of intent to offer a new appointment 90 days before the termination date. Failure to provide advance notice shall not entitle an employee to renewal of the contract.

4. *Dismissal During the Term of the Contract:*

A. The Board may dismiss the Administrator/Professional Staff Member for cause at any time on recommendation of the President of the College provided that the Administrator/Professional Staff Member is given at least thirty days written notice of the grounds for dismissal and afforded an opportunity for reconsideration by the President.

B. The President of the College may immediately suspend with pay an Administrator/Professional Staff Member who is recommended for dismissal as provided herein.

C. An Administrator/Professional Staff Member who is dismissed by the Board shall have the right to file a grievance with the Secretary of Personnel for the State of Maryland.

D. In the event that the Administrator/ Professional Staff Member is dismissed, this Contract shall automatically terminate as of the effective date of the dismissal and the College shall have no further obligation under this Contract.

E. Nothing in this contract shall be construed to limit the authority of the Board to terminate this agreement based on fiscal exigency.

* * *

7. *Non-applicability of Tenure or Similar Status:*

It is specifically understood and agreed that the Administrative/Professional Staff Member shall not be deemed to be granted tenure or similar status by virtue of entering into this agreement.

* * *

10. *Entire Agreement:*

This contract contains the complete agreement between the Administrator/Professional Staff Member and the Board. This agreement shall be governed by the laws of the State of Maryland and the policies and procedures of the College and, as of its effective date, shall supersede all other agreements between the parties. Any modification of this agreement shall be in writing and signed by both parties; however, nothing in this agreement shall be construed to limit the authority of the Board to establish, amend or modify the policies and/or procedures of the College.

On January 22, 1992, prior to the commencement of Dr. Samuels's service, the Board adopted a "Revised Policy for the Appointment and Evaluation of Administrators and Professional Staff" (the "Revised Policy"), which was attached as an exhibit to the complaint. The Revised Policy included a cover page that discussed its rationale, explaining that the Revised Policy "creates a plan for the appointment, evaluation, and retention of administrators and professional staff at [BCCC]." Moreover, the cover letter indicated that the Revised Policy made several "major changes," including:

1. One-year contracts for administrators and professional staff will be replaced by letters of appointment offered by the President and accepted by the employees before

beginning work. The appointments will have no end date; administrators and professional staff will serve at the pleasure of the President and the Board of Trustees.

2. Self-assessment and evaluation will be based on the employee['s] performance in achieving their goals that were approved in their previous evaluation.

\* \* \*

Letters of appointment will be offered to newly hired administrators and professional staff, effective immediately. Currently employed administrators and professional staff will be offered letters of appointment at the end of their current contract period, provided the College elects to continue their employment.

The Revised Policy provided, in pertinent part:

1. *DEFINITIONS*

 a. *Administrators and Professional Staff*

 For purposes of this evaluation policy, administrators and professional staff are full-time, permanent employees, including the Vice Presidents.... This policy does not apply to the President, who is evaluated by the Board of Trustees.

\* \* \*

2. *GENERAL POLICY*

 a. Administrators and professional staff must accept letters of appointment offered by the President before beginning work. The appointments will have no end date; administrators and professional staff will serve at the pleasure of the President and the Board of Trustees.

 b. [BCCC] will conduct annual performance evaluations of administrators and professional staff in accordance with the policy and procedures stated in this document.

c. Newly hired administrators and professional staff will be required to prepare, within the first 3 months of their employment, a list of 4 to 6 goals. These goals must represent specific, quantifiable objectives appropriate to the administrative/professional position; these goals must be approved by the employee's supervisor.

## 3. EVALUATION POLICY

Administrators and professional staff will be evaluated according to the procedures and criteria stated below. Each evaluation will result in a rating of excellent, very good,[5] good, fair, or poor.

a. Administrators and professional staff whose first evaluation results in a rating of fair or poor will be given a thirty day notice of termination at the conclusion of the evaluation process, which is defined as the date the Board of Trustees accepts the staff recommendation for termination.

b. After the initial evaluation, administrators and professional staff who are rated fair will work with their supervisors to develop an action plan that will, if followed, result in measurably improved performance within a reasonable period of time, to be determined by the supervisor. If the next rating of an administrator or professional staff remains fair or descends to poor, the employee will be given a thirty day notice of termination at the conclusion of the evaluation process, which is defined as the date the Board of Trustees accepts the staff recommendation for termination.

c. After the initial evaluation, administrators and professional staff who are rated poor will be given a thirty day notice of termination at the conclusion of the evaluation process, which is defined as the date the

---

5. A note on the Revised Policy indicated that the rating of "very good" was not originally part of the Revised Policy, but was added by the President's staff on or about January 6, 1993.

Board of Trustees accepts the staff recommendation for termination.

The evaluation procedures referred to in the Revised Policy included responsibilities for both the administrator/staff member and that individual's supervisor. The administrator/staff member was to perform a self-assessment, list goals for the successive evaluation period, and prepare a current job description. The supervisor was required to rate the administrator/staff member upon review of the materials prepared by the administrator/staff member and an interview.

After completing an evaluation, the supervisor was required to submit his or her conclusions, along with the materials prepared by the administrator/staff member, to the supervisor's superior. But, the Revised Policy made clear that "[e]valuations conducted by the President are not subject to review." In all cases other than a presidential review, the evaluation materials were ultimately submitted to the appropriate vice president who, upon satisfaction of the remaining criteria, was "responsible for taking the recommendations to the President." Under the heading "EVALUATION PROCEDURES," the Revised Policy concluded:

■ e. *Consultation with the Administrator or Professional Staff*

The supervisor who performed the evaluation should discuss the evaluation with the administrator or professional staff, give the employee an opportunity to make comments about the evaluation, have him or her sign the evaluation and provide him or her with a copy. The supervisor should then pass the materials on to the appropriate Vice President who will be responsible for taking the recommendations to the President.

g.[6] *Reconsideration by the President*

Administrators and professional staff recommended for termination may request reconsideration by the President.

---

**6.** The paragraphs skip from "e" to "g" without any apparent omission.

h. *Recommendations to the Board of Trustees by the President*

The President will make recommendations to the Board of Trustees for terminations at the next meeting of the Board. There is no appeal to the Board of Trustees of the President's recommendation.

As Dr. Samuels's supervisor, Dr. Tschechtelin completed a written evaluation of appellant on August 26, 1993, for the period of Dr. Samuels's first 18 months at BCCC, from February 3, 1992 to June 30, 1993. Dr. Tschechtelin rated Dr. Samuels as "very good" and recommended a salary increase. The complaint suggested that this was the only occasion Dr. Samuels was evaluated, "despite the [Revised Policy's] requirements" of an annual evaluation.

Notwithstanding the favorable evaluation in August 1993, Dr. Tschechtelin "notified Dr. Samuels that he was terminated via correspondence dated January 17, 1995," effective February 17, 1995. The termination was allegedly without cause. Although the correspondence was not attached to the complaint, appellant claimed it directed him "to remove his personal effects from his office within 3 days and provided no further information with respect to appeals, reconsideration, or otherwise." No mention was made of any action by the Board in connection with the termination.

According to the complaint, Dr. Tschechtelin subsequently made a defamatory statement to Yvette Aldrich, a staff writer for *The Baltimore Afro–American* (the "Newspaper"), a newspaper circulated in the Baltimore metropolitan area with a readership of approximately 88,000 persons. The statement was published in an article on March 11, 1995, which attributed to Dr. Tschechtelin the comment "that Samuels had been terminated for poor performance." The article was not included as an exhibit to the complaint.

On February 28, 1996, Dr. Samuels filed suit, seeking compensatory and punitive damages and attorneys' fees. Appellees answered on June 13, 1996, asserting, *inter alia,* five affirmative defenses: (1) Dr. Samuels failed to state a claim upon which relief could be granted; (2) appellant's suit was barred by sovereign immunity; (3) the individual Trustees and Dr. Tschechtelin were protected by qualified immunity; (4) appellees' actions were based on "reasonable factors other than race, color or national origin"; and (5) Dr. Samuels "was terminated because of poor performance and an unwillingness to improve his performance." Appellees' answer was accompanied by a motion to dismiss all counts.

On August 30, 1996, appellees filed an amended answer that included as an additional affirmative defense the contention that Dr. Samuels's contract claims (counts I and II) were barred by the statute of limitations. Appellees again raised the statute of limitations in a "Reply Memorandum in Support of Defendants' Motion to Dismiss," filed on September 20, 1996. In a "surreply" filed in opposition to appellees' reply memorandum, appellant claimed that appellees waived the defense of statute of limitations because they failed to raise it in the original answer. At a hearing on appellees' motion to dismiss, the circuit court agreed with appellant's waiver argument as to the statute of limitations. In addition, the court determined that there was a dispute between the parties as to the validity of the Employment Contract. But, by orders dated December 23, 1996, and March 7, 1997, the circuit court (Dancy, J.) dismissed Counts III, IV, and VI against all appellees; Count V as against the State, the Board, and the Trustees; and Count VII as against the State and the Board. Accordingly, Count V, as against Dr. Tschechtelin, and Count VII, against the individual Trustees and Dr. Tschechtelin, remained viable.

### B. Motions For Summary Judgment

On April 3, 1997, appellees filed their first motion for summary judgment with respect to those claims that the court had not dismissed in its orders of December 1996 and March

1997. Appellees' memorandum filed in support of their motion included numerous exhibits, including an affidavit by Dr. Tschechtelin dated April 3, 1997. There, Dr. Tschechtelin referred to the August 26, 1993, evaluation mentioned in appellant's complaint. The 1993 report, which was attached to Dr. Tschechtelin's affidavit, highlighted various strengths and weaknesses of appellant, and said, in part:

> Dr. Samuels is a man of strong academic experience who is quite familiar with issues related to faculty and academic life. He expresses high expectations for excellence among students and faculty. He is friendly, hard working, and committed to the philosophy of the community college. During the past year, he was instrumental in preparing for the successful Middle States self-study and subsequent accreditation team visit.
>
> He does a good job when he addresses student groups and organizations, encouraging them to do their best and motivating them to work hard.
>
> Among his major accomplishments during the past months are developing a program review and evaluation policy, improving the planning and budget development process for the division, and assisting with the development of a plan for assessing student learning outcomes.
>
> He also initiated the updating and standardizing of the course syllabus format for all College courses, a part-time faculty handbook, meetings of the Academic Advisory Councils, plans for tech prep, and the introduction of Supplemental Instruction in the developmental area.
>
> * * *
>
> Dr. Samuels needs to be more "PR conscious." In addition to making sure that the fundamentals of sound academic life are in place, he needs to be sure that there are well publicized innovations that capture the imagination of people and that motivate sponsors to provide increased funding. He needs to continue to work on the improvement of teamwork with his peers.

He needs to increase his informal interaction and communication with the faculty members. I suggest that he visit classes and department meetings. I would also like him to become more active and visible in community activities and events.

His personal follow-up on projects the details of their implementation [sic] needs to be improved, as in the case of the [Student Instructional Report] data in faculty evaluation.

Dr. Samuels needs to be careful to be objective in the evaluation of persons in his division.

Dr. Tschechtelin's report also documented a number of goals for Dr. Samuels for the coming year, including:

• Taking steps to improve educational quality as measured by trends in the student success (retention to graduation), job placement among graduates of career programs, and academic success upon transfer.

• Promoting teamwork among the College divisions.

• Assuring proper and timely administration of the Student Instructional Report, using it in the performance evaluation process, and working with faculty about how to use it to improve instruction.

• Developing plans for two new career programs.

• Providing the oversight necessary to assure an excellent self-study and team visit of the Respiratory Technology program.

• Coordinating the design and implementation of a faculty development program.

• Evaluating the department chairs in their administrative capacity.

• Making greater use of his personal computer, including using LAN mail, and checking it every day.

As we noted, in the evaluation, Dr. Tschechtelin rated Dr. Samuels as "very good" and recommended a salary increase. The last page of the report contains the signatures of Dr. Tschechtelin and Dr. Samuels.

Notwithstanding the positive characterizations of appellant's work in the August 1993 report, Dr. Tschechtelin averred in his affidavit that Dr. Samuels failed to satisfy nearly all of the goals in that report, including:

improving teamwork with his peers; improving his follow-up on projects and paying more attention to detail; assuring the proper and timely implementation of the Student Instructional Report in evaluating faculty members; developing plans for two new academic programs; providing oversight to assure an excellent self-study and successful visit of the accreditation team for the Respiratory Therapy program; and making greater use of his personal computer, including LAN mail (e-mail).

According to Dr. Tschechtelin, Dr. Samuels's alleged deficiencies prompted Dr. Tschechtelin to draft a memorandum targeting five areas of improvement. The memorandum, dated June 16, 1994, provided, in part:

There are several areas needing improvement that I would like to discuss with you.... In the interest of clear communication, I have written about them; that way we can discuss them at our next bi-weekly meeting. I would like you to:

1. Get closer to the details of the Academic Affairs Division. You need to be more involved in the key aspects of your division, asking questions, and making sure that what your staff does makes sense to you. For example, the budget proposal for two new faculty members in FY 1996 plus an honors program at $10,000 does not seem possible for $82,000. I would like you to make increasing use of data tables to help guide decisions, such as the replacement of faculty when a vacancy occurs.

2. Understand and apply the principles involved in the new fiscal reality. I was disappointed that your division, with a budget of over $10 million, had not one idea about how funds could be recycled....

3. Be better organized and follow up on requests. Specifically, I want you to maintain a list of the things that I have asked you to do and to report on the status of each of them when we have our bi-weekly meetings....

4. Lead the Academic Affairs Division away from "divisionism" and toward a greater sense of teamwork. There are too many persons in the Academic Affairs Division who regard it as inherently superior to the other divisions of the College....

5. Take initiative to think through the roots of key problems and challenges, outline the alternatives that we have for addressing them, summarize this in brief written form, and discuss it with me. An example of this is the recent contention with the faculty and the evaluation process in particular.

Dr. Tschechtelin further averred that he prepared this memorandum in anticipation of Dr. Samuels's upcoming evaluation for the 1993/1994 term. On June 22, 1994, Dr. Samuels responded to the document with a seven-page memorandum addressing Dr. Tschechtelin's points, and said:

I am not someone recently off the streets who need [sic] close supervision. Present me with clear, agreed upon objectives, a timeline for their accomplishment, reporting deadlines and reasonable resources, and the objectives will be accomplished. *They will be accomplished.* For reasons beyond my comprehension, my professional standing is being devalued. It is clear that we need to review the fit between myself and the current institutional environment. I welcome the opportunity to do so at our next meeting.

Although Dr. Samuels and Dr. Tschechtelin met on June 28, 1994, to discuss the memoranda, Dr. Tschechtelin stated that he saw little improvement during the ensuing three month period. Accordingly, on October 4, 1994, Dr. Tschechtelin informed appellant that he "needed to make a change in the vice presidency and that [Dr. Samuels] should look for a new position." Dr. Tschechtelin offered to help Dr. Samuels find a

new job, and gave him the option of resigning. Because Dr. Samuels had not yet vested in the college's retirement program, Dr. Tschechtelin also told Dr. Samuels that he could remain at the College in a "professorial position."

On October 27, 1994, Dr. Samuels told Dr. Tschechtelin that he was convinced that Dr. Tschechtelin was motivated by "racial discrimination." Dr. Tschechtelin claimed that he was both upset and surprised by the accusation, because "this was the first time [Dr. Samuels] had accused me of racial discrimination." On November 10, 1994, Dr. Samuels rejected the various options offered by Dr. Tschechtelin.

After detailing more than a dozen alleged deficiencies with respect to appellant's performance, Dr. Tschechtelin recounted the following:

> At the Board meeting on December 21, 1994, I informed the Trustees of my decision to recommend Dr. Samuels' termination. At the meeting, I described the problems with Dr. Samuels' performance and the series of meetings that I had held with Dr. Samuels. I also reported that Dr. Samuels had rejected my offers of a faculty position or of assistance in finding a new job. During this December meeting, members of the Board questioned me as to the procedural correctness of his [sic] action, e.g., the steps I had taken to discuss the problems with Dr. Samuels in an attempt to find solutions.

Dr. Tschechtelin delivered a letter of termination to appellant on January 17, 1995, effective February 17, 1995. The letter stated, in pertinent part:

> I have carefully considered your work at the Baltimore City Community College and have evaluated your performance as poor. You have, among other things, not taken sufficient initiative for innovation and change and have been out of touch with important details of the Academic Affairs Division. For these reasons, I plan to recommend to the Board of Trustees that you be dismissed from employment at the College, effective February 17, 1995.

Effective immediately, you are relieved of further responsibilities and placed on administrative leave. Please remove your personal effects from your office by the close of business on January 20, 1995.

The following day, January 18, 1995, Dr. Tschechtelin recommended the dismissal of Dr. Samuels to the Board at a closed session. According to the minutes of the Board meeting, Dr. Tschechtelin "gave a chronology of his meetings with Dr. Samuels to discuss Dr. Samuels' performance evaluations and areas needing improvement. Dr. Tschechtelin noted specific areas where Dr. Samuels did not exercise his leadership and management responsibilities." The minutes also reflect that the Board was advised that Dr. Samuels "was given an opportunity to address the performance issues . . . and failed to make improvement." Moreover, the Board was told that Dr. Samuels disagreed "with almost all of the performance issues raised by Dr. Tschechtelin and claimed that [Dr. Tschechtelin's] comments were racially motivated." In the course of the Board's discussion of the matter, "it became apparent that the night before the meeting, Dr. Samuels had called . . . the African American members of the Board to request that he be permitted to address them directly." The Board denied Dr. Samuels's request to appeal to the Board, noting a previously approved policy governing such matters.

On March 11, 1995, the Newspaper printed a story reporting Dr. Samuels's termination, which said, in part:

The [BCCC] African American Issues Committee, charging that the firing of the school's vice president of academic affairs was "politically motivated" and has worsened racial and gender tensions at the school, has called for an investigation into the dismissal as well as other areas of the school's administration.

Dr. Frank Samuels, the highest ranking African American at the college, was given a letter of termination on Jan. 17, and three days to clear his office and be off campus.

The letter came from BCCC's president, James Tschechtelin, and while the committee said that it was not

questioning his right to terminate employees, "we believe that the vice president was fired for the wrong reasons and that the manner in which he was fired destabilized the institution."

*When asked about the complaint, Dr. Tschechtelin said it would be unethical to discuss the details of Dr. Samuels' termination because it is a personnel matter. However, he did state that after long consideration the Board of Trustees concluded that Dr. Samuels' performance was poor.*

* * *

Dr. Samuels told the AFRO that among the problems he encountered at the school, racism was one of the largest.

"When I was dismissed, the president reached down three levels to find a White male to replace me. Thus, bypassing the second in command, an African American female with extensive experience at the vice president's level," said Dr. Samuels.

Dr. Samuels also provided a list of 42 accomplishments he made at Baltimore City Community College which he feels proves that he was a strong advocate for change.

(Emphasis added).

In an attempt to defeat summary judgment, Dr. Samuels submitted a number of materials, including excerpts of deposition testimony. We focus here on his undated affidavit, which provides a detailed and lengthy recapitulation of his version of the central factual disputes.

In his affidavit, Dr. Samuels described his former position at BCCC and detailed his accomplishments. Additionally, he asserted that Dr. Tschechtelin told appellant on numerous occasions that appellant's performance was excellent. Dr. Samuels continued: "Tschechtelin recognized my contributions were so extensive that whenever I advised Tschechtelin of other employment opportunities, including presidencies and vice chancellorships at other institutions, Tschechtelin told me that I was an asset to the college and that he wanted me to stay in my position." Appellant claimed, however, that his

relationship with Dr. Tschechtelin began to sour after a faculty meeting in May 1994. According to Dr. Samuels, the faculty protested the use of Student Instructional Reports in their evaluations, and criticized Dr. Tschechtelin for budget cuts that resulted in the loss of five teaching positions. When the meeting became "heated," and one professor accused Dr. Tschechtelin of lying, Dr. Samuels maintained that he "had to come to Tschechtelin's aid to reestablish decorum." The following paragraph from appellant's affidavit is pertinent:

It was clear to those present that Tschechtelin could not maintain order and that the teachers responded to and respected me. After this meeting, Tschechtelin complained to me that I was not "controlling the faculty" and to stop "this divisionism." Tschechtelin threatened to withhold raises from the faculty because he thought them unappreciative. I advised him against this course. After this meeting, where it was apparent that I, an African American, had more influence and respect in the College than he, Tschechtelin and my relationship demonstratively cooled.

Dr. Samuels suggested that these incidents culminated in the June 16, 1994, memorandum from Dr. Tschechtelin to Dr. Samuels. Appellant explained that he drafted his June 22, 1994, reply memorandum because he "was suspicious of the timing of Tschechtelin's memorandum." Upon meeting to discuss the memoranda, appellant acknowledged that he and Dr. Tschechtelin apologized and shook hands. Nevertheless, appellant "noted [a] continuing deterioration" in his relationship with Dr. Tschechtelin, claiming that Dr. Tschechtelin became increasingly hostile and critical. Dr. Samuels attributed this behavior to racism, stating:

Tschechtelin did not become hostile towards me until it became obvious that I, as an African American, had more influence than he at a predominantly African–American institution. So long as I did not obviously display my abilities and so cast Tschechtelin into shadow, Tschechtelin was pleased with and complimentary about my contributions.

After a court hearing on May 28, 1997, the circuit court (Mitchell, J.) issued an order, docketed on June 18, 1997, granting summary judgment to appellees on the remaining parts of counts V and VII, and on counts I and II as against the Trustees and Dr. Tschechtelin in their individual capacities. But, the court denied appellees' motion as to counts I and II against the Board and Dr. Tschechtelin in their official capacities. The court said, *inter alia,* that appellees "did not timely plead the statute of limitations defense and it is waived."

Thereafter, both sides filed motions for reconsideration. In addition, Dr. Samuels filed a "First Amended Complaint" on August 11, 1997,[7] seeking to reinvigorate the contract claims alleged in the initial complaint and adding a third count for wrongful discharge. On August 25, 1998, appellees moved to dismiss or for summary judgment. At a hearing on December 8, 1997, the circuit court (Mitchell, J.) dismissed the additional count in the amended complaint and denied the motions to reconsider. These rulings are embodied in an order of December 8, 1997, as clarified and amended by an order of December 15, 1999.[8]

After the disposition of the motions on December 8, 1997, the defendants appealed the court's ruling as to the contract claims under the collateral order doctrine. They argued that Dr. Samuels's contract claims were barred by sovereign immunity under Md.Code (1984, 1999 Repl.Vol.), § 12–202 of the State Government Article ("S.G."). Dr. Samuels filed a cross-appeal, challenging the disposition of most of his claims. We held that Dr. Samuels's contract claims were barred by sovereign immunity and declined to review Dr. Samuels's issues. *Tschechtelin v. Samuels,* 124 Md.App. 389, 400, 722 A.2d 414 (1999) ("*Tschechtelin I* "). In a per curiam order, the Court of

---

7. Unless otherwise noted, our references to the "complaint" shall be to the original complaint.

8. The court's order of December 8, 1997, was inconsistent with its oral ruling, because it incorrectly stated that certain claims had been reinstated. That error was corrected in the order of December 15, 1999.

Appeals reversed, concluding that the appeal was premature. Accordingly, the appeal was dismissed. *Samuels v. Tschechtelin,* 353 Md. 508, 727 A.2d 929 (*"Tschechtelin II "*).

On remand to the circuit court, appellees filed a second motion for summary judgment, relying on this Court's reasoning in *Tschechtelin I.* After a hearing on September 27, 1999, the circuit court (Cannon, J.) agreed, concluding that summary judgment should be "granted on Counts I and II . . . for the reasons stated by the Court of Special Appeals in *Tschechtelin* [*I*] . . . and because the statute of limitations began to run on January 18, 1995."

We shall include additional facts in our discussion.

## II. DISCUSSION

### A. Motion to Dismiss

### 1. Standard of Review

In reviewing the trial court's grant of a motion to dismiss, we assume the truth of all well-pleaded facts in the complaint and reasonable inferences drawn therefrom. *See Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624 (1995); *Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 333–34, 624 A.2d 496 (1993); *Fick v. Perpetual Title Co.,* 115 Md.App. 524, 547 n. 4, 694 A.2d 138, *cert. denied,* 347 Md. 153, 699 A.2d 1168 (1997). Moreover, we must consider those facts and inferences in the light most favorable to appellant. *See Berman v. Karvounis,* 308 Md. 259, 264–65, 518 A.2d 726 (1987); *Parker v. Kowalsky & Hirschhorn, P.A.,* 124 Md.App. 447, 458, 722 A.2d 441 (1999). If the complaint fails facially to disclose a legally sufficient cause of action, then we must affirm the dismissal order of the motion court. *See Lubore v. RPM Assocs.,* 109 Md.App. 312, 322, 674 A.2d 547, *cert. denied,* 343 Md. 565, 683 A.2d 177 (1996); *Hrehorovich v. Harbor Hosp. Ctr., Inc.,* 93 Md.App. 772, 785, 614 A.2d 1021 (1992), *cert. denied,* 330 Md. 319, 624 A.2d 490 (1993). This means that we must affirm the court-ordered dismissal if, even assuming the truth of the facts alleged, Dr. Samuels is not

entitled to relief as a matter of law. *See Lubore,* 109 Md.App. at 322, 674 A.2d 547.

## 2. Due Process Claims Against Dr. Tschechtelin and the Trustees—Counts III and IV

Preliminarily, we begin with a clarification of those issues that Dr. Samuels has abandoned on appeal. Counts III and IV of the complaint asserted due process claims against Dr. Tschechtelin, the Board, the Trustees, and the State, under the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights. At oral argument, Dr. Samuels conceded that the trial court properly dismissed the federal due process claims under the Fourteenth Amendment, because appellant had an alternative avenue for relief under 42 U.S.C. § 1983, as asserted in Count VII, which was duplicative of the federal constitutional claim. Moreover, Dr. Samuels does not challenge the dismissal of the alleged State constitutional violations in Counts III and IV as against the State and the Board.

Therefore, as to counts III and IV, we consider only whether the court erred in dismissing the claims against Dr. Tschechtelin and the Trustees for alleged violations of Article 24 of the Maryland Declaration of Rights. Article 24 provides "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

Appellees counter that the court properly dismissed appellant's claims. They aver that Dr. Samuels failed to allege facts showing the personal involvement or individual actions of the Trustees with respect to appellant's termination. Appellees also maintain that "the record is devoid of evidence that guarantees under either the due process or equal protection clauses were violated." [9]

---

9. We agree with appellees that appellant does not complain on appeal that he was denied equal protection under either Article 24 or the

We begin by reviewing the pertinent portions of counts III and IV.

## COUNT III

### Procedural Due Process

\* \* \*

37. Based upon Plaintiff's Employment Contract with the College and Plaintiff's compliance therewith, Plaintiff had legitimate liberty and property interests protected by the due process clauses of the Maryland Declaration of Rights and the 14th Amendment to the United States Constitution.

38. These constitutionally protected interests may not be terminated without procedural due process. The fundamental requirements of due process include: the opportunity to be heard at a meaningful time and in a meaningful manner; a hearing conducted by an impartial tribunal; compliance with the established provisions of the Policy for the Evaluation of Administrative and Professional Staff; and a full and fair opportunity to be heard on all pertinent issues prior to a final determination regarding termination of employment.

39. Despite the express provisions of Plaintiff's Employment Contract and the policies and procedures of the College with respect to the evaluation and termination of administrative and professional staff, Defendants failed to perform the required annual evaluations of the Plaintiff, failed to provide Plaintiff the opportunity to seek reconsideration of the decision to terminate him, and otherwise terminated the Plaintiff's employment without cause.

Fourteenth Amendment. Therefore, we need not consider that issue. *See Electronics Store, Inc. v. Cellco P'ship,* 127 Md.App. 385, 395, 732 A.2d 980, *cert. denied,* 356 Md. 495, 740 A.2d 613 (1999) ("[I]t is not this Court's responsibility to attempt to fashion coherent legal theories to support appellant's sweeping claims."); *Conaway v. State,* 108 Md. App. 475, 484, 672 A.2d 162 ("[I]n the absence of argument in the brief, the point need not be considered by this [C]ourt."), *cert. denied,* 342 Md. 472, 677 A.2d 565 (1996).

These actions and/or omissions among other things denied Plaintiff procedural due process.

40. Likewise, the Defendants individually owed the Plaintiff the duty to comply with all of the College's own rules, regulations and policies, including the policy of the evaluation of administrative and professional employees as well as to comply with constitutional due process requirements ..., the Defendants deprived the Plaintiff of his due process rights by failing to perform the required annual evaluations, failing to follow established policies and procedures, failing to make a reasonable determination of cause for dismissal, failing to provide Plaintiff the opportunity to seek reconsideration of the recommendation to terminate him and otherwise in terminating the plaintiff other than for cause.

\* \* \*

## COUNT IV

### Substantive Due Process
\* \* \*

45. Based upon Plaintiff's Employment Contract with the College and Plaintiff's compliance therewith, Plaintiff had legitimate property and liberty interests protected by the due process clauses of the Maryland Declaration of Rights and the 14th Amendment to the United States Constitution.

46. These protected interests may not be terminated without substantive due process. The protection of substantive due process include [sic] the right to be free from deprivation of protected liberty and/or property interests through arbitrary and capricious state action.

47. Defendants denied Plaintiff substantive due process by, among other things, failing to perform the required annual evaluations, failing to make a determination of cause for dismissal, failing to provide Plaintiff the opportunity to seek reconsideration of the recommendation to terminate

his employment, failing to terminate the Plaintiff for cause and otherwise failing to comply with the policies and procedures of the College and the requirements of substantive and procedural due process.

48. Likewise, the Defendants individually, owed a duty to comply with all of the College's own rules, regulations and policies including the Policy for the Evaluation of Administrative and Professional Staff, as well as to comply with constitutional due process requirements.

Responding to these allegations through their motion to dismiss, appellees contended that appellant failed to state a claim upon which relief could be granted, stating:

3. Counts III (Procedural Due Process) and IV (Substantive Due Process) fail to state a claim upon which relief can be granted as to all Defendants, with respect to the claims based on the 14th Amendment. Where an alternate avenue of relief exists, a claim cannot be brought based directly on the Constitution. *Bivens v. Six Unknown Names* [sic] *Agents* [*of Fed. Bureau of Narcotics* ], 403 U.S. 388[, 91 S.Ct. 1999, 29 L.Ed.2d 619] (1971). Counts III and IV should also be dismissed because they are duplicative to the due process claims in Count VII (§ 1983).

4. *Counts III and IV, alleging violations of rights guaranteed under the Maryland Declaration of Rights, fail to state a claim upon which relief may be granted.* Constitutional claims are barred by the doctrine of sovereign immunity and Counts III and IV hence must be dismissed with respect to the institutional defendants. *The Maryland constitutional claims must be dismissed as to the defendants named in their individual capacities because they fail to allege sufficient facts to support the claims that the defendants were personally involved in the allegedly violative conduct.*

(Emphasis added).

Although it is clear that the circuit court dismissed counts III and IV in their entirety, it does not appear that the court actually considered the State constitutional claims under Arti-

cle 24. The court's memorandum accompanying the order of December 23, 1996, provided, in relevant part:

The Defendant[s] contend[ ] that the constitutional claims under Counts 3 and 4 for Procedural and Substantive Due Process should be dismissed for failure to state of [sic] claim since they are based directly on the 14th Amendment due process clause of the U.S. Constitution and these claims can be asserted under § 1983 and are duplications of the claims brought under Count 6[sic], which is under § 1983. It is agreed that these counts should be dismissed. Section 1983 claims sl ;ɔuld be dismissed as to the college and as to the State of Maryland. Dismissal is appropriate as to the college because it is a state entity. As to the individual defendants, there [sic] qualified immunity and the extent to which they possess it in this instance would be a question of fact.

Nevertheless, the corresponding order of the same date said nothing about counts III and IV. Rather, it stated:

ORDERED, that Defendant's Motion to Dismiss is GRANTED, as to Counts V as to all Defendant[s] except Tschechtelin, VII (1983) as to the individual Defendants, Count VII (1981 and Maryland Declaration of Rights), and it is further;

ORDERED, that Defendants' Motion to Dismiss is DENIED, as to all other Counts.

Recognizing these and other inconsistencies, appellees filed a motion to correct the order on January 2, 1997. That motion alleged:

1. The Memorandum states that Counts III and IV (counts based directly on U.S. Constitution) should be dismissed. The order does not refer to Counts III and IV and should be corrected to include these two counts.

2. The Order grants the Motion to Dismiss "as to Count VII (1983) as to the individual Defendants." Based on the text of the Memorandum, that should be corrected to "Count VII (1983) as to the *institutional* defendants."

3. The Order grants the Motion to Dismiss "as to Count VII (1981 and Maryland Declaration of Rights.)" It is Count VI that states the claim under § 1981.

Based on a reading of the Court's decision and order, it appears that the Court intended to grant the motion to dismiss as to: Counts III, IV and VI in their entirety; Count V (defamation) as to all defendants with the exception of James D. Tschechtelin; and Count VII as to all claims except the § 1983 claims against the individual defendants.

By order of March 7, 1997, the court adopted appellees' proposed revisions and stated, in part: "ORDERED, that Defendants' Motion to Dismiss is GRANTED as to: Counts III, IV, and VI (§ 1981) in their entirety...."

Under Md. Rule 2–322(c), a motion to dismiss is treated as one for summary judgment if "matters outside the pleading are presented to and not excluded by the court." *See Green v. H & R Block,* 355 Md. 488, 501, 735 A.2d 1039 (1999). There is no indication, however, that the court considered any material outside of appellant's complaint, including the exhibits attached and incorporated by reference, or that it treated the motion as one for summary judgment. *See* Md. Rule 2–303(d) ("A copy of any written instrument that is an exhibit to a pleading is a part thereof for all purposes."); *Allied Inv. Corp. v. Jasen,* 123 Md.App. 88, 95 n. 2, 716 A.2d 1085 (1998), *rev'd on other grounds,* 354 Md. 547, 731 A.2d 957 (1999); *Bell Atlantic–Md., Inc. v. Maryland Stadium Auth.,* 113 Md.App. 640, 651, 688 A.2d 545 (1997); *McIntyre v. Guild, Inc.,* 105 Md.App. 332, 354 n. 6, 659 A.2d 398 (1995). Therefore, our review of the propriety of the dismissal of the State constitutional claims alleged in counts III and IV depends on the content and adequacy of appellant's complaint, including the exhibits appended to it.

The College, along with its governing Board, is a State agency afforded the protections of sovereign immunity. *Tschechtelin I,* 124 Md.App. at 398, 722 A.2d 414, *rev'd on other grounds, Tschechtelin II,* 353 Md. 508, 727 A.2d 929 (1999); E.A. § 16–503(b); *cf. Board of Trustees of Howard*

*Community College v. John K. Ruff, Inc.,* 278 Md. 580, 591, 366 A.2d 360 (1976) (concluding that the Board of Trustees of Howard Community College "was an agency of the State" for purposes of sovereign immunity). The State has waived sovereign immunity in a contract action as to "a written contract that an official or employee executed for the State or 1 of its units while the official or employee was acting within the scope of the authority of the official or employee." S.G. § 12–201(a); *see ARA Health Servs. v. Department of Pub. Safety & Corr. Servs.,* 344 Md. 85, 685 A.2d 435 (1996).

 Absent legislative waiver, the doctrine of sovereign immunity precludes a damages action against the State for alleged violations of Article 24. *See Ritchie v. Donnelly,* 324 Md. 344, 369, 597 A.2d 432 (1991). But, a public official who violates a plaintiff's Maryland constitutional rights may be personally liable for compensatory damages. *See Okwa v. Harper,* 360 Md. 161, 199–200, 757 A.2d 118 (2000); *Ritchie,* 324 Md. at 370, 597 A.2d 432; *Clea v. Mayor of Baltimore,* 312 Md. 662, 680, 541 A.2d 1303 (1988). Thus, an individual who has been deprived of his liberty or property interests in violation of Article 24 "may enforce those rights by bringing a common law action for damages." *Widgeon v. Eastern Shore Hosp. Ctr.,* 300 Md. 520, 538, 479 A.2d 921 (1984). Moreover, punitive damages against a public official are recoverable upon a showing of actual malice. *Clea,* 312 Md. at 680, 541 A.2d 1303. It is also settled that, in one complaint, a plaintiff may bring separate causes of action under § 1983 and Article 24. *Widgeon,* 300 Md. at 534, 479 A.2d 921.[10]

 Both Article 24 and the Due Process Clause of the

10. In an action under 42 U.S.C. § 1983, a State official can be sued in his or her individual capacity, official capacity, or both. In certain instances, the official may be entitled to qualified immunity. See discussion of § 1983, *infra.* But, Maryland does not recognize the official/individual dichotomy for violations of Article 24, and State officials are not entitled to qualified immunity in a suit under that provision. *See Okwa,* 360 Md. at 201–02, 757 A.2d 118; *Ritchie,* 324 Md. at 373, 597 A.2d 432.

Fourteenth Amendment [11] protect an individual's interests in substantive and procedural due process. *See Office of People's Counsel v. Maryland Pub. Serv. Comm'n,* 355 Md. 1, 26–27, 733 A.2d 996 (1999) (discussing substantive due process); *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 508–09, 709 A.2d 142 (1998) (discussing procedural due process). Accordingly, our courts have long equated the Due Process Clause and Article 24. *See Comm'n on Med. Discipline v. Stillman,* 291 Md. 390, 414 n. 9, 435 A.2d 747 (1981); *Pitsenberger v. Pitsenberger,* 287 Md. 20, 27, 410 A.2d 1052 (1980); *City of Annapolis v. Rowe,* 123 Md.App. 267, 270, 717 A.2d 976 (1998) (stating that Article 24 " 'protects due process rights and is construed *in pari materia* with the federal Due Process Clause' " (citation omitted)). Consequently, Supreme Court decisions interpreting the Due Process Clause "are practically direct authority for the meaning of the Maryland provision." *Garnett v. State,* 332 Md. 571, 613 n. 20, 632 A.2d 797 (1993); *accord Owens v. State,* 352 Md. 663, 669 n. 3, 724 A.2d 43, *cert. denied,* 527 U.S. 1012, 119 S.Ct. 2354, 144 L.Ed.2d 250 (1999).

Counts III and IV implicate what we have termed "categories" of due process actions, namely: (1) a procedural due process claim premised on the deprivation of a property interest; (2) a procedural due process claim premised on the deprivation of a liberty interest; (3) a substantive due process claim premised on the deprivation of a property interest; and (4) a substantive due process claim premised on the deprivation of a liberty interest.

■ To be successful in an action alleging denial of procedural due process in violation of a property interest, a plaintiff must demonstrate that he had a protected property interest, that he was deprived of that interest, and that he was afforded less process than was due. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538–41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Rowe,* 123 Md.App. at 275–76, 717 A.2d 976. In

---

11. When we refer to the "Due Process Clause," we mean the clause in the Fourteenth Amendment of the federal Constitution.

*Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court discussed what constitutes a protected property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. 2701; *see Bannum, Inc. v. Town of Ashland,* 922 F.2d 197, 200 (4th Cir.1990) ("The Fourteenth Amendment does not grant property interests; rather, it protects those interests, derived from an independent source, from deprivation by the state without due process.").

Appellant argues that he was not an at-will employee. Rather, he contends that the State was bound by the terms of the written Employment Contract, as supplemented by the Revised Policy. Moreover, he claims these documents created constitutionally protected property and liberty interests. Referring to ¶ 4 of the Employment Contract, he averred in the complaint that the Board could only terminate him "for cause," upon thirty days written notice, and after an opportunity for reconsideration by the President. He claims that the College attempted to satisfy the "for cause" component of the contract by discharging appellant for "poor performance." Presumably relying on ¶ 2(C) of the Revised Policy, he also alleged that appellees were obligated to conduct an annual performance evaluation. According to the complaint, appel-

lees failed to comply with the terms of the documents, which led to "severe economic damage, the loss of [appellant's] job, the loss of self-esteem and stature in the community, the loss of professional opportunities, [and] extreme emotional pain and suffering."

Appellees vigorously maintain that appellant was an at-will employee with "no interest in continued employment." Therefore, they insist that appellant had no constitutionally protected property or liberty interest. In making that argument, they rely on the contention that the Employment Contract was never signed. Rather, appellees assert that the only contract provided to Dr. Samuels was the Letter of Appointment, which made him an at-will employee because it had no fixed duration. Similarly, appellees argue that the Revised Policy, which had "no end date," was not enforceable as a contract, because it was not signed by a State official or employee. Alternatively, appellees argue that the termination did not violate the evaluation procedure in the Revised Policy, because the Revised Policy does not preclude termination at any time when an administrator's performance is inadequate.

An employment agreement may either be for a fixed term or at-will. *Hrehorovich*, 93 Md.App. at 790, 614 A.2d 1021. An agreement is deemed at-will, and thus terminable without cause, when it fails to specify a particular time or event terminating the employment relationship. *Shapiro v. Massengill*, 105 Md.App. 743, 754, 661 A.2d 202, *cert. denied*, 341 Md. 28, 668 A.2d 36 (1995). As the designation implies, an employer may ordinarily terminate an at-will employee at any time, for almost any reason or for no reason. *Suburban Hosp., Inc. v. Dwiggins*, 324 Md. 294, 303, 596 A.2d 1069 (1991); *University of Baltimore v. Iz*, 123 Md.App. 135, 170, 716 A.2d 1107, *cert. denied*, 351 Md. 663, 719 A.2d 1262 (1998); *Shapiro*, 105 Md.App. at 754, 661 A.2d 202. But, at-will employment is subject to modification "by the provisions of an employee handbook or the provisions of a personnel policy." *Iz*, 123 Md.App. at 171, 716 A.2d 1107; *see Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 490, 665 A.2d 297

(1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996); *Elliott v. Board of Trustees,* 104 Md.App. 93, 655 A.2d 46 (1995); *Staggs v. Blue Cross of Md., Inc.,* 61 Md.App. 381, 392, 486 A.2d 798, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985).

■■■■ Nevertheless, an important exception limits the termination of an at-will employee. An at-will employee may pursue a claim for wrongful discharge if the termination violates a "clear mandate of public policy...."[12] *Adler v. American Standard Corp.,* 291 Md. 31, 47, 432 A.2d 464 (1981); *see Molesworth v. Brandon,* 341 Md. 621, 672 A.2d 608 (1996); *Ewing v. Koppers Co.,* 312 Md. 45, 537 A.2d 1173 (1988); *Bleich v. Florence Crittenton Servs. of Baltimore, Inc.,* 98 Md.App. 123, 632 A.2d 463 (1993). Thus, an at-will employee cannot be "discharged for exercising constitutionally protected rights." *Castiglione v. Johns Hopkins Hosp.,* 69 Md. App. 325, 338, 517 A.2d 786 (1986), *cert. denied,* 309 Md. 325, 523 A.2d 1013 (1987). Nor can an at-will employee be terminated for "refusal to engage in illegal activity, or the intention to fulfill a statutorily prescribed duty." *Adler v. American Standard Corp.,* 830 F.2d 1303, 1307 (4th Cir.1987).

■■■ In contrast to employment at-will, when an employment agreement specifies a definite term, it may only be terminated prior to the end of that term for "just cause." *Shapiro,* 105 Md.App. at 754, 661 A.2d 202; *see Chai Mgmt., Inc. v. Leibowitz,* 50 Md.App. 504, 513, 439 A.2d 34 (1982). In *Shapiro,* 105 Md.App. at 760, 661 A.2d 202, we explained:

The concept of "just cause" does not lend itself to a mathematically precise definition. Indeed, "[t]here is no single definition of what constitutes good cause for discharge." Rather, whether conduct amounts to "just cause" necessarily varies with the nature of the particular employment. Simply put, what satisfies just cause in the context of one kind of employment may not rise to just cause in another employment situation.

---

12. We note that appellant did not bring a tort claim for wrongful discharge.

*Accord Sachs v. Regal Sav. Bank,* 119 Md.App. 276, 284, 705 A.2d 1 (1998), *aff'd,* 352 Md. 356, 722 A.2d 377 (1999).

 A public employment contract may confer a constitutionally protected property interest in continued employment. *See Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Roth,* 408 U.S. at 576–77, 92 S.Ct. 2701; *cf. Marriott v. Cole,* 115 Md.App. 493, 509–510 & n. 9, 694 A.2d 123 (discussing state university faculty member's claim that she was terminated in contravention of protected property interest evidenced by contract), *cert. denied,* 347 Md. 254, 700 A.2d 1215 (1997). Moreover, a public employee with a property interest in continued employment is ordinarily entitled to a limited hearing prior to termination and a more comprehensive hearing after termination. *See Rowe,* 123 Md.App. at 276, 717 A.2d 976; *see also Loudermill,* 470 U.S. at 542, 105 S.Ct. 1487; *Roth,* 408 U.S. at 569–70, 92 S.Ct. 2701.

 Appellant concedes that "[i]f, under State law, Dr. Samuels was purely an at-will employee, his contract could not give rise to a constitutionally protected property interest" in his employment. *See Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Elliott v. Kupferman,* 58 Md.App. 510, 520, 473 A.2d 960 (1984). But, appellant maintains that he was not an at-will employee and that, at the very least, a factual question existed as to his status, rendering dismissal inappropriate.

 Although appellees deny that the State executed a written Employment Contract, we pause to reiterate that, on a motion to dismiss, the motions court was required to assume the truth of all facts alleged in the complaint, and to consider the facts and inferences in the light most favorable to appellant. Nor was it the function of the motions court to consider matters outside the pleadings in order to resolve disputed facts. Therefore, the lower court could not determine from the pleadings whether appellant actually had a contract. Nor could it decide if appellant was terminated for cause or, instead, for a bogus or illegal reason. Similarly, the complaint

does not reveal on its face that the terms of the contract were satisfied. For example, it is not evident from the complaint that Dr. Samuels received thirty days written notice or an opportunity for reconsideration by the College President. Moreover, although the Revised Policy provided for an annual evaluation, the complaint does not reflect that this occurred.

Accordingly, based on what was before the court at the motion to dismiss, we must assume, *arguendo*, that appellant was not an at-will employee. Therefore, for purposes of the motion to dismiss, it appears that appellant had a property interest in his employment. If appellant had a property interest in continued employment, as alleged, the question arises as to what process, if any, he was due. That determination generally depends on a balancing of three factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) the governmental interest. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *accord Gilbert v. Homar*, 520 U.S. 924, 931-32, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997); *Rowe*, 123 Md.App. at 276, 717 A.2d 976.

In the posture of a motion to dismiss, we are persuaded that the court erred in dismissing appellant's procedural due process claim against Dr. Tschechtelin in Count III. As the President of the College, Dr. Tschechtelin was responsible for conducting an annual evaluation. Appellant also averred in the complaint that he was terminated without "an opportunity for reconsideration," and Dr. Tschechtelin was allegedly implicated in the termination of Dr. Samuels, without an opportunity for reconsideration.

Even assuming Dr. Samuels had a contract-based property interest in his employment, however, we discern no legally sufficient cause of action against the individual Trustees. The Trustees are simply listed by name in a preliminary paragraph in the Complaint and defined collectively as the "Trustees." Thereafter, they are lumped under the general

title of "Defendants" and summarily included in each of appellant's seven counts. "Bald assertions and conclusory statements by the pleader will not suffice." *Bobo v. State,* 346 Md. 706, 708–09, 697 A.2d 1371 (1997); *accord Campbell v. Cushwa,* 133 Md.App. 519, 534, 758 A.2d 616 (2000). Indeed, appellant's response filed on August 27, 1996, in opposition to appellees' motion to dismiss, does little to advance Dr. Samuels's claims:

> Counts III[and] IV ... clearly state that each member of the Board of Trustees *individually* owed a duty to comply with the rules, regulations and policies. The Complaint sets forth allegations that the Board of Trustees, individually and collectively, by going outside of the Board's stated policies, deprived the Plaintiffs [sic] of their due process rights by, among other things, failing to follow college policies, failing to give Plaintiffs [sic] a formal review of their termination and denying them the reasonable opportunity to a fair and meaningful hearing. In acting as they did, the members individually failed to follow the Board's *own* directives set forth in the policy manual, despite Dr. Samuels' request for a hearing.
>
> Furthermore, the Complaint alleges that the acts were done deliberately and maliciously. An agent who acts with malice is not protected from personal liability and an agent will be held accountable to third persons for his own misconduct. As the individual Board members have been alleged to have departed from their scope of their authority, there has been a sufficient allegation that the Board members are individually liable for their misconduct in reviewing Plaintiffs' [sic] termination. Thus, the Complaint adequately states a claim for ... due process violation by the individual members of the Board of Trustees.

(Citations omitted).

We next consider the second due process "category," which focuses on the purported denial of due process based on the deprivation of a liberty interest. Dr. Samuels alleged in his complaint that Dr. Tschechtelin "made a statement to

Yvette M. Aldrich, a staff writer for the Newspaper ... indicating that Samuels had been terminated for poor performance," which was published on March 11, 1995. Appellant contends that the publication of the statements resulted in a deprivation of his liberty interest, in violation of the Due Process Clause.[13]

A liberty interest is not the same as a property interest. *See Roth,* 408 U.S. 564, 572–78, 92 S.Ct. 2701, 33 L.Ed.2d 548 (discussing the distinction between liberty and property interests). "In the context of dismissals from employment, one's *liberty* interest may be implicated where the employee has no cognizable right to the continued employment, but the dismissal serves to fetter some other Constitutional right that he does have." *Elliott v. Kupferman, supra,* 58 Md.App. at 519, 473 A.2d 960. For example, dismissal based on illegal discrimination may violate a liberty interest. *Poolaw v. City of Anadarko,* 660 F.2d 459, 463–64 (10th Cir.1981). Similarly, termination of employment in retribution for the exercise of First Amendment rights implicates a liberty interest. *Perry,* 408 U.S. at 597–98, 92 S.Ct. 2694.

An employee's liberty interest may also be implicated when a dismissal "is accompanied by charges that might damage the employee's reputation in the community and [the employee] is given no opportunity to respond" or when "it imposes [on the employee] some stigma or disability that forecloses other employment opportunities (such as barring him from other public employment)." *Elliott,* 58 Md.App. at 519, 473 A.2d 960; *see Paul v. Davis,* 424 U.S. 693, 709–10, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Roth,* 408 U.S. at 573, 92 S.Ct. 2701; *Leese v. Baltimore County,* 64 Md.App. 442, 461–

---

13. Presumably because the circuit court made no mention of appellant's State constitutional claims in dismissing counts III and IV, appellant limited his appellate argument as to Article 24 to a discussion of *Widgeon,* 300 Md. 520, 479 A.2d 921, which recognizes a plaintiff's right to bring separate causes of action under Article 24 and § 1983 in the same complaint. *Id.* at 534–35, 479 A.2d 921. Consequently, we have looked to appellant's discussion of § 1983 for guidance as to the allegedly infringed liberty interest.

63, 497 A.2d 159, *cert. denied,* 305 Md. 106, 501 A.2d 845 (1985), *overruled in part on other grounds, Harford County v. Town of Bel Air,* 348 Md. 363, 704 A.2d 421 (1998). As the Supreme Court explained in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Id.* at 437, 91 S.Ct. 507; *see Bishop v. Wood,* 426 U.S. at 348, 96 S.Ct. 2074; *Beckham v. Harris,* 756 F.2d 1032, 1038 (4th Cir.), *cert. denied,* 474 U.S. 903, 106 S.Ct. 232, 88 L.Ed.2d 231 (1985). In that situation, due process would allow the employee "an opportunity to refute the charge," or "to clear his name." *Roth,* 408 U.S. at 573 & n. 12, 92 S.Ct. 2701; *see Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977).

Invocation of an employee's liberty interest is generally dependent on the following:

> [T]he terminated employee must show that his former employer has published false statements about him. He must also show that these untruths are preventing him from securing similar employment. Lastly, it must appear that the false information was of such a stigmatizing nature that it virtually "foreclosed his freedom to take advantage of other employment opportunities."

*Leese,* 64 Md.App. at 460–61, 497 A.2d 159 (citations omitted). Whether a dismissal is "stigmatizing" depends on the charge used as grounds for termination, not the actual consequence of the charge. *Id.* at 461, 497 A.2d 159 (citing *Stretten v. Wadsworth Veterans Hosp.,* 537 F.2d 361, 365 (9th Cir.1976)).

A false statement that merely offers an evaluation of an employee's work performance is not violative of the employee's liberty interest, however. *Leese,* 64 Md.App. at 462, 497 A.2d 159. Moreover, as recently reiterated by the federal district court in Maryland, "even if … statements 'may have been defamatory under state law, that tort alone does not constitute a constitutional deprivation. Rather, unjustified state action must so seriously damage the plaintiff's

reputation and standing in his community as to foreclose his freedom to take advantage of other economic opportunities.'" *Carroll v. City of Westminster*, 52 F.Supp.2d 546, 562 (D.Md. 1999) (quoting *Jackson v. Long*, 102 F.3d 722, 730 (4th Cir. 1996)); *see Pleva v. Norquist*, 195 F.3d 905, 916 (7th Cir.1999); *cf. Paul*, 424 U.S. at 706, 96 S.Ct. 1155 (stating that the Supreme Court "has never held that the mere defamation of an individual . . . was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment").

We find instructive the Fourth Circuit's decision in *Bunting v. City of Columbia*, 639 F.2d 1090 (4th Cir.1981). There, the Police Department for the City of Columbia, South Carolina hired Charles Bunting and Kenneth Tyler as police officers in April 1975. In January 1976, Bunting and Tyler received their first written evaluations, listing areas in need of improvement. Thereafter, in June 1976, the officers received their second, and final, written evaluations, which recommended termination. Accordingly, a police captain notified Bunting and Tyler that they were terminated immediately. Although the discharged employees sought the opportunity to appeal, the city manager denied their requests on the ground that they were 12–month probationary employees and, therefore, not entitled to an appeal. Upon inquiry from the press, the police chief "commented that the two policemen were discharged because they *did not fulfill the police department's expectations*. The police chief's comments were published in the Columbia newspapers." *Id.* at 1093 (emphasis added).

Bunting and Tyler argued, *inter alia*, that they had liberty interests that were violated in the course of their dismissal. Their claim was evidently premised on the notion that "their dismissal was accompanied by comments of the police chief, which appeared in the local newspapers, and that these comments placed such a stigma on them as to require that they be given an opportunity to clear their names at a hearing." *Id.* at 1094. Citing the principles set forth above, the Fourth Circuit rejected that argument, stating:

Although there was some publicity surrounding the discharges of Tyler and Bunting, the only reason for their dismissal that was made public was that their services did not meet the expectations of the police department. Such a remark cannot be viewed as a comment of such damaging effect as to impair Bunting's and Tyler's standing in the community. Furthermore, we are not willing to conclude that they were stigmatized to such a degree that their freedom to take advantage of other employment opportunities was foreclosed. Certainly, a person who has been fired may be somewhat less attractive to other potential employers, but it would be stretching the concept too far to conclude that a person's liberty interest is impaired merely because he has been discharged.

*Id.* at 1094–95 (citations omitted).

These authorities lead us to conclude that, even if Dr. Tschechtelin's statement proves to be defamatory, we cannot say that it was so stigmatizing as to warrant procedural due process protection of a liberty interest. Therefore, we perceive no error in the court's ruling.

The third and fourth categories of due process implicated in appellant's complaint concern purported property and liberty interests in the context of substantive due process. In general terms, "substantive due process places a restraint on the use of government power beyond that imposed by procedural due process; public officials must grant an individual certain procedural formalities and, in addition, cannot arbitrarily deprive an individual of a constitutionally protected interest even if they follow the proper procedures." David H. Armistead, Note, *Substantive Due Process Limits on Public Officials' Power to Terminate State–Created Property Rights*, 29 Ga. L.Rev. 769, 774 (1995); *see Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Thus, substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Wash-*

*ington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997).

■■■ Whether appellant was deprived of a protected property interest in violation of substantive due process turns on whether an alleged state-law contract right is so fundamental as to require substantive due process protections. We conclude that it does not.

Although we have not found any decisions by the Supreme Court, the Court of Appeals, or this Court that have resolved the issue, we are not without guidance. In his concurring opinion to *Regents of the Univ. of Mich. v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), Justice Powell observed:

Even if one assumes the existence of a property right . . . , not every such right is entitled to the protection of substantive due process. While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution.

The history of substantive due process "counsels caution and restraint." The determination that a substantive due process right exists is a judgment that " 'certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.' " In the context of liberty interests, this Court has been careful to examine each asserted interest to determine whether it "merits" the protection of substantive due process. "Each new claim to [substantive due process] protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed."

The interest asserted by respondent . . . is essentially a state-law contract right. It bears little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution. It certainly is not closely tied to "respect for the teachings of history, solid recognition of the basic values that underlie our society, and wise appreciation of the great roles that the doctrines of

federalism and separation of powers have played in establishing and preserving American freedoms." For these reasons, briefly summarized, I do not think the fact that [the state] may have labeled this interest "property" entitles it to join those other, far more important interests that have heretofore been accorded the protection of substantive due process.

*Id.* at 229–30, 106 S.Ct. 507 (Powell, J., concurring) (citations omitted); *cf. Bishop,* 426 U.S. at 350, 96 S.Ct. 2074 ("The Due Process Clause ... is not a guarantee against incorrect or ill-advised personnel decisions.").

Justice Stevens, writing for a unanimous Court in *Ewing,* 474 U.S. at 223, 106 S.Ct. 507, assumed the existence of a protected property interest in resolving the case. The matter of whether a state-created property interest can qualify as an interest in property sufficient to justify substantive due process protections was, therefore, left undecided. *See* Armistead, *supra,* at 780 & nn. 65–66 (acknowledging split among the U.S. Circuit Courts of Appeal, and stating that "some ... courts have cited *Ewing* when recognizing substantive due process claims for arbitrary terminations of state-created property interests," while other "courts have cited Justice Powell's concurrence in *Ewing* to support their denial of substantive due process claims in these situations"). Nevertheless, we are persuaded by Justice Powell's concurrence in *Ewing,* as well as the decisions of those federal circuits that have addressed the issue. They have determined that, although state-created property rights may be entitled to procedural due process, they are not entitled to substantive due process protection. *See, e.g, Thornquest v. King,* 82 F.3d 1001, 1003 n. 2 (11th Cir.1996); *Local 342 v. Town Bd. of Huntington,* 31 F.3d 1191, 1196 (2d Cir.1994); *Sutton v. Cleveland Bd. of Educ.,* 958 F.2d 1339, 1350–51 (6th Cir.1992); *Reich v. Beharry,* 883 F.2d 239, 243 (3d Cir.1989).

We also find helpful the federal court's decision in *Myers v. Town of Landis,* 957 F.Supp. 762 (M.D.N.C.1996), *aff'd,* 107 F.3d 867 (4th Cir.1997). In that case, Buford Myers alleged, *inter alia,* that he was discharged from public employment in

violation of his Fourteenth Amendment substantive due process rights. In addressing that contention, and awarding summary judgment, the court stated, in relevant part:

> [A]ny right that Myers may have had to continued employment with the Town of Landis is not protected by substantive due process. Substantive due process protects fundamental rights created by the Constitution. *Huang v. Board of Governors of Univ. of N.C.,* 902 F.2d 1134, 1142 n. 10 (4th Cir.1990) (citing *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 229–30, 106 S.Ct. 507, 515–16, 88 L.Ed.2d 523 (1985) (Powell, J., concurring)). Myers's right to his job, if any, was created by state contract law, and does not implicate substantive due process. *McKinney v. Pate,* 20 F.3d 1550, 1556 (11th Cir.1994) (en banc), *cert. denied,* 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995); *see Huang,* 902 F.2d at 1142 n. 10.

*Myers,* 957 F.Supp. at 770; *cf. Huang,* 902 F.2d at 1142 n. 10 (noting that if the appellant in that case was entitled to his employment position, that entitlement "is essentially a state law contract right, not a fundamental interest embodied in the Constitution"). Recognizing that North Carolina's highest state appellate court had "held that the 'law of the land' clause of the state constitution, Art. I, § 19, has the same meaning and effect as the Due Process clause of the Federal Constitution," the *Myers* court granted summary judgment in connection with Myers's substantive due process claims under the North Carolina constitution. *Myers,* 957 F.Supp. at 770–71.

In light of the foregoing, and in the absence of any contrary conclusion by our courts interpreting Article 24, we are satisfied that appellant's purported property interest is not entitled to substantive due process protection. *Cf. Maryland Classified Employees Ass'n v. State,* 346 Md. 1, 21–22, 694 A.2d 937 (1997) (discussing, generally, substantive due process claim arising out of termination of public employment).

■ We next consider the merits of appellant's contention that he was deprived of a liberty interest in violation of his right to substantive due process. This contention need not

detain us long, for we conclude that the "liberty" interest that appellant contends is implicated here is not of such a character as to warrant substantive due process protections under State law. We explain.

■■■■■■■ Consistent with the preceding discussion, the Supreme Court has "observed that the Due Process Clause specifically protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg,* 521 U.S. at 720–21, 117 S.Ct. 2258 (citations omitted). Moreover, analysis of an alleged substantive due process violation "must begin with careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (alteration in original) (quoting *Collins v. Harker Heights,* 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). Whether a challenged state action implicates a *fundamental right* is a threshold determination. *Glucksberg,* 521 U.S. at 722, 117 S.Ct. 2258.

Under Supreme Court jurisprudence, in addition to those freedoms enumerated in the federal Bill of Rights, an individual's Fourteenth Amendment liberty interest "includes the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Id.* at 720, 117 S.Ct. 2258 (citations omitted); *cf. In re Adoption/Guardianship No. TPR970011,* 122 Md.App. 462, 473, 712 A.2d 597 (1998) (acknowledging that "the fundamental right of a parent to raise his or her child is in the nature of a liberty interest that is protected under" Article 24 and the Fourteenth Amendment).

In sum, we affirm the dismissal of counts III and IV as against the Trustees in their entirety. We also affirm the dismissal of count IV against Dr. Tschechtelin. But, we

vacate the dismissal of Count III as it pertains to appellant's procedural due process claim against Dr. Tschechtelin premised on a purported contract-based property interest.

## B. Motions For Summary Judgment

### 1. Standard of Review

"Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *King v. Board of Educ.*, 354 Md. 369, 376, 731 A.2d 460 (1999); *see* Md. Rule 2–501(e); *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.*, 129 Md.App. 455, 465, 742 A.2d 79 (1999); *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 386, 693 A.2d 370 (1997). In reviewing the circuit court's grant of summary judgment, we evaluate "the same material from the record and decide[ ] the same legal issues as the circuit court." *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998).

In order to proceed to trial, the non-moving party must first produce evidence of a disputed material fact. *See Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994); *Wankel v. A & B Contractors, Inc.*, 127 Md.App. 128, 156, 732 A.2d 333, *cert. denied*, 356 Md. 496, 740 A.2d 614 (1999). A material fact is one that will alter the outcome of the case, depending upon how the fact-finder resolves the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Faith v. Keefer*, 127 Md.App. 706, 734, 736 A.2d 422, *cert. denied*, 357 Md. 191, 742 A.2d 521 (1999). In opposing the motion, the non-moving party must present more than "mere general allegations which do not show facts in detail and with precision." *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993). Moreover, the court views the facts, and all reasonable inferences drawn from the facts, in the light most favorable to the non-moving party. *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675 (1995); *Electronics Store, Inc. v. Cellco P'ship, supra*, 127 Md.App. at 395, 732 A.2d 980.

When there are no disputes of material fact, the court may resolve the case as a matter of law. *See* Md. Rule 2–501(e). In reviewing the trial court's decision, we determine whether the court reached the correct legal result. *Beatty,* 330 Md. at 737, 625 A.2d 1005. Generally, we review an award of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995).

### 2. Breach of Contract and Implied Covenant of Good Faith—Counts I and II

In its June 1997 order, the circuit court granted summary judgment with respect to counts I and II as against Dr. Tschechtelin and the Trustees in their individual capacities. Appellant does not appear to challenge that ruling. Rather, Dr. Samuels challenges the award of summary judgment in September 1999, which effectively disposed of counts I and II in favor of the remaining defendants. In entering judgment in appellees' favor, the circuit court relied on our opinion in *Tschechtelin I,* in which we determined that the claims were barred by sovereign immunity. Appellant argues, however, that this Court erred in its analysis in *Tschechtelin I.* Although we are not bound by our prior opinion, we remain satisfied that appellant's contract claims are precluded by sovereign immunity.

The doctrine of sovereign immunity "precludes suit against governmental entities absent the State's consent." *ARA Health Servs., Inc.,* 344 Md. at 91–92, 685 A.2d 435; *see Condon v. State of Md.-Univ. of Md.,* 332 Md. 481, 492, 632 A.2d 753 (1993); *Dep't. of Pub. Safety & Corr. Servs. v. ARA Health Servs., Inc.,* 107 Md.App. 445, 456, 668 A.2d 960 (1995), *aff'd,* 344 Md. 85, 685 A.2d 435 (1996). Thus, the doctrine of sovereign immunity protects the State from interference with governmental functions and allows it to control its own agencies and funds. *Maryland State Highway Admin. v. Kim,* 353 Md. 313, 333, 726 A.2d 238 (1999); *Condon,* 332 Md. at 492, 632 A.2d 753; *Katz v. Washington Suburban Sanitary Comm'n,* 284 Md. 503, 507, 397 A.2d 1027 (1979). The doc-

trine also applies to State agencies and instrumentalities. *Kim,* 353 Md. at 333, 726 A.2d 238; *Katz,* 284 Md. at 507, 397 A.2d 1027. Ordinarily, this protection applies absent express waiver of immunity by legislation and a corresponding provision of funds necessary to satisfy judgments. *Condon,* 332 Md. at 492, 632 A.2d 753.

As we noted earlier, in S.G. § 12–201, the Legislature waived sovereign immunity for contract actions initiated against the State and its instrumentalities, so long as the claim is "based on a written contract that an official or employee executed for the State...." The waiver is not without limitation, however. S.G. § 12–202 provides:

A claim under this subtitle is barred unless the claimant files suit within 1 year after the later of:

(1) the date on which the claim arose; or

(2) the completion of the contract that gives rise to the claim.

 Appellant maintains that the one-year filing deadline set forth in S.G. § 12–202 is a statute of limitations. Accordingly, he contends that appellees' failure to raise the statute of limitations as an affirmative defense in their first answer effected a waiver of the defense under Md. Rule 2–323(g). We rejected that argument in *Tschechtelin I,* stating that "[t]he rule in Maryland is that when a statute creating a cause of action contains a limitation period on the filing of such cause of action that limitation will not be considered an ordinary statute of limitations but rather a condition precedent to maintaining the cause of action." *Tschechtelin I,* 124 Md.App. at 399, 722 A.2d 414 (citing *Slate v. Zitomer,* 275 Md. 534, 542–43, 341 A.2d 789 (1975), *cert. denied sub nom. Gasperich v. Church,* 423 U.S. 1076, 96 S.Ct. 862, 47 L.Ed.2d 87 (1976)). Accordingly, we concluded that S.G. § 12–202's filing deadline was a substantive part of the sovereign immunity statute, and served as "a condition precedent to the maintenance of contract claims under the statutory waiver of sovereign immunity of [S.G.] § 12–201." *Tschechtelin I,* 124 Md.App. at 399, 722 A.2d 414.

In the present appeal, Dr. Samuels refers us to "legislative history" in an apparent effort to demonstrate that the General Assembly intended the one-year filing deadline to function as a statute of limitations, not a condition precedent. The so-called "history" consists of (1) a questionnaire distributed to local bar associations by a gubernatorial commission charged with studying sovereign immunity shortly before the enactment of the statutory predecessor to S.G. § 12–202, and (2) a memorandum "contained in the Bill File at the Department of Legislative Reference," which refers to the one-year filing deadline as a "statute of limitations." Neither persuasively contravenes the reasoning we offered in *Tschechtelin I.*

Moreover, appellant overlooks what the Court of Appeals said in *Board of Trustees of Howard Community College v. Ruff, supra,* 278 Md. at 583, 366 A.2d 360:

It is of no moment that the matter of sovereign immunity was not raised below by the pleadings or otherwise.... '[T]he law is well established that counsel for the State or one of its agencies may not ... by failure to plead the defense, waive the defense of governmental immunity in the absence of express statutory authorization....'

(Citation omitted). Here, appellees raised the defense of sovereign immunity in their original answer. In our view, that defense necessarily encompassed S.G. § 12–202 as to filing, which appellant failed to satisfy.

Appellant's alternative argument, to the effect that his suit was timely because limitations began to run from the date of publication of the defamatory statement in March 1996, is equally unavailing. As indicated, Dr. Tschechtelin delivered a letter of termination to appellant on January 17, 1995, the Board agreed with Dr. Tschechtelin's recommendation to terminate Dr. Samuels on January 18, 1995, and the termination was effective February 17, 1995. It is settled that a cause of action for breach of contract accrues, and the limitations period begins to run, when a plaintiff knows or should have known of the breach. *See Vigilant Ins. Co. v. Luppino,* 352 Md. 481, 489, 723 A.2d 14 (1999). Appellant

filed his complaint on February 28, 1996, more than one year after appellant knew of the allegedly wrongful termination, and more than a year after the effective date of that termination. "[H]aving failed to bring an action within the time requirement of [S.G.] § 12–202," appellant "may not take advantage of the waiver of sovereign immunity of [S.G.] § 12–201." *Tschechtelin I*, 124 Md.App. at 400, 722 A.2d 414.

 Finally, we point out that it is not necessarily fatal if the defense of statute of limitations is not asserted in the original answer. We find support for this position in MARYLAND RULES COMMENTARY. The authors of that treatise note that "Rule 2–323 does not contain an explicit sanction for the failure to include the specified affirmative defenses in an answer." Paul V. Niemeyer and Linda M. Schuett, MARYLAND RULES COMMENTARY, at 198 (2d ed.1992). Although affirmative defenses may be waived if not asserted in the initial answer, "the court may permit a party to cure the waiver. . . . The liberal amendment policy . . . should permit a party to amend any defense or to include a new defense unless it is not in the interest of justice to relieve a party from the waiver." *Id.* Moreover, the treatise specifically observes that when a defendant seeks to amend an answer to add a statute of limitations defense that was omitted from the initial answer, a "waiver . . . is not automatic. . . ." *Id.* at 199. Rather, the plaintiff must show "prejudice, unfair surprise, or lack of fairness." *Id.*

Accordingly, for all these reasons, we shall affirm the award of summary judgment to appellees with respect to appellant's contract claims in counts I and II.

## C. Defamation—Count V

Appellant contends that the court erred in awarding summary judgment with respect to his defamation claim against Dr. Tschechtelin. As noted above, the Newspaper reported that Dr. Tschechtelin "state[d] that after long consideration the Board of Trustees concluded that Dr. Samuels' perfor-

mance was poor." Appellant asserts that the assertion was false and that it was made with actual malice.

In his April 1997 affidavit, Dr. Tschechtelin explained the context in which he made that statement:

On or about March 9, 1995, I received a call from a reporter from the Baltimore *Afro American,* Yvette Aldrich, who asked me about Dr. Samuels' termination. I stated that he had been terminated for poor performance and explained to Ms. Aldrich that I could not comment on it any further as it was a personnel matter. The personnel actions of the Board of Trustees are public records under State law and the Board's policy for evaluation of administrators states that poor evaluation leads to termination.

Unpersuaded by the adequacy of appellant's allegations, the court said at the hearing on appellees' first motion for summary judgment on May 28, 1997:

Plaintiff brings an action under count five for defamation. And that, of course, applies only to the president of the college. Even assuming all other elements of the tort are supported in the record, we are having difficulty determining the harm that is plead by the Plaintiff.

The presence of harm is a necessary element, because he must present evidence of damage. His allegation is that of lost job opportunities. Well we searched the record, and found nothing to substantiate any lost job opportunity or impairment to his future. We are not satisfied that the record in this case on any of the elements has been maintained. And we will grant the motion for summary judgment as to count five.

Under Maryland law, a defamatory statement is one that "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." *Batson v. Shiflett,* 325 Md. 684, 722–23, 602 A.2d 1191 (1992); *see Rosenberg v. Helinski,* 328 Md. 664, 675, 616 A.2d 866 (1992), *cert. denied,* 509 U.S. 924, 113 S.Ct. 3041, 125 L.Ed.2d 727 (1993); *Shapiro,* 105 Md.App.

at 772, 661 A.2d 202. To establish a *prima facie* case of defamation when the plaintiff is not a public figure, the plaintiff must prove: (1) that the defendant made a defamatory communication to a third person; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm. *Thacker v. City of Hyattsville*, 135 Md.App. 268, 313, 762 A.2d 172, 196 (2000); *Rosenberg*, 328 Md. at 675, 616 A.2d 866; *Bagwell*, 106 Md.App. at 510–11, 665 A.2d 297.

The "fault" element of the calculus may be based either on negligence or actual malice. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Batson*, 325 Md. at 728, 602 A.2d 1191; *Jacron Sales Co. v. Sindorf*, 276 Md. 580, 594–97, 350 A.2d 688 (1976). As we explained in *Shapiro*, 105 Md.App. at 772, 661 A.2d 202, actual malice "is established when the plaintiff shows, by clear and convincing evidence, that the defendant published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity." On the other hand, negligence need only be shown by a preponderance of the evidence. *Id.* at 773, 661 A.2d 202 (citing *General Motors Corp. v. Piskor*, 277 Md. 165, 171–72, 352 A.2d 810 (1976)).

The statement in issue here—that Dr. Samuels was terminated for poor performance—is arguably a statement of opinion. The parties do not discuss the tort of defamation based on a statement of opinion. We note, however, that defamatory communications may be based on assertions of fact or opinion. Restatement (Second) of Torts §§ 565, 566 (1977). As the Supreme Court indicated, a false statement of fact cannot escape liability for defamation under the guise of opinion. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Thus, when an expression of opinion contains implied assertions of underlying objective fact, the statement may be actionable. *Id.* at 18–19, 110 S.Ct. 2695.

The modern law governing the distinction between fact and opinion in defamation cases emerged in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in which the Supreme Court stated:

Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

(Footnote omitted).

The *Gertz* Court did not provide guidance with regard to determining whether a statement is one of fact or opinion. But, in *Milkovich*, the Supreme Court explained:

Read in context ... the fair meaning of the passage is to equate the word "opinion" in the second sentence [of *Gertz* ] with the word "idea" in the first sentence. Under this view, the language was merely a reiteration of Justice Holmes' classic "marketplace of ideas" concept.

Thus, we do not think this passage from *Gertz* was intended to create a wholesale defamation exemption for anything that might be labeled "opinion." ... Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of "opinion" may often imply an assertion of objective fact.

*Milkovich*, 497 U.S. at 18, 110 S.Ct. 2695 (citations omitted). The Supreme Court reasoned in *Milkovich* that publishing an opinion couched as a fact may be just as damaging as publishing an erroneous fact. *Id.* at 19, 110 S.Ct. 2695. Therefore, it held that the statements of a newspaper columnist who asserted that a wrestling coach had committed perjury in an investigation of an incident at a wrestling match were not protected as opinion. *Id.* at 18, 110 S.Ct. 2695.

In reaching that result, the Court distinguished the statements about perjury from earlier cases concerning opinions as protected speech. For example, in *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26

L.Ed.2d 6 (1970), a newspaper published articles characterizing a real estate developer's negotiating position as "blackmail." Rejecting the claim that the word "blackmail" implied that the developer had committed the crime of blackmail, the Court held that "the imposition of liability on such a basis was constitutionally impermissible...." *Id.* at 13, 90 S.Ct. 1537. The Court reasoned that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. 1537. Similarly, in *Old Dominion Branch No. 496, National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), the Court determined that use of the word "traitor" to refer to a union "scab" was not actionable, because it was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty ... expression of ... contempt ..." *Id.* at 284–86, 94 S.Ct. 2770.

*Batson,* 325 Md. 684, 602 A.2d 1191, is also instructive in understanding statements of opinion. The Court of Appeals held there that statements made in a series of leaflets published by a faction of a labor union that ousted its president were not protected as mere opinion. *Id.* at 726, 602 A.2d 1191. The pamphlets included language that appellant's behavior was motivated "to steer [the reader's] attention away from their crimes of conspiracy, perjury, falsification of records, illegal contract ratification and violation of both the National [Union's] Constitution and By–Laws for your Union." *Id.* at 694, 602 A.2d 1191. Relying on *Milkovich,* the Court concluded that such remarks were not protected as "mere opinion," because they were capable of being proved or disproved. *Id.* at 724–25, 602 A.2d 1191.

*Hearst Corp. v. Hughes,* 297 Md. 112, 466 A.2d 486 (1983), also touched on the issue of when a statement of opinion may be defamatory. Although the Court ultimately concluded that the defendant had acted culpably in making false statements of fact, the Court distinguished between "pure" and "mixed"

opinions, citing the Restatement with approval. *Id.* at 131, 466 A.2d 486.

The Restatement and its comments further clarify when a statement of opinion is actionable:

### § 566. Expressions of Opinion

**A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.**

\* \* \* \* \*

*b. Types of expressions of opinion.* There are two kinds of expression of opinion. The simple expression of opinion, or the pure type, occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character. The statement of facts and the expression of opinion based on them are separate matters in this case, and at common law either or both could be defamatory and the basis for an action for libel or slander. The opinion may be ostensibly in the form of a factual statement if it is clear from the context that the maker is not intending to assert another objective fact but only his personal comment on the facts which he has stated.

\* \* \* \* \*

The second kind of expression of opinion, or the mixed type, is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication. Here the expression of the opinion gives rise to the inference that there are undisclosed facts that justify the forming of the opinion expressed by the defendant. To say of a person that he is a thief without explaining why, may, depending upon the circumstances, be found to imply the

assertion that he has committed acts that come within the common connotation of thievery. To declare, without an indication of the basis for the conclusion, that a person is utterly devoid of moral principles may be found to imply the assertion that he has been guilty of conduct that would justify the reaching of that conclusion.

\* \* \* \* \*

c.

\* \* \* \* \*

The requirement that a plaintiff prove that the defendant published a defamatory statement of fact about him that was false ... can be complied with by proving the publication of an expression of opinion [based on] undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion.... [A]n expression of opinion that ... implies that there are undisclosed facts on which the opinion is based, is treated differently [from a pure opinion]. The difference lies in the effect upon the recipient of the communication.... [When the opinion is a mixed opinion] if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.

\* \* \* \* \*

It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct, and the function of the jury to determine whether that meaning was attributed to it by the recipient of the communication.

(Boldface in original) (citations omitted).

Of significance here, our courts continue to recognize the distinction between defamation *per se* and defamation *per*

*quod. Shapiro,* 105 Md.App. at 773, 661 A.2d 202; *Gooch v. Maryland Mechanical Sys., Inc.,* 81 Md.App. 376, 393, 567 A.2d 954, *cert. denied,* 319 Md. 484, 573 A.2d 807 (1990). That distinction was set forth in the seminal opinion of *M & S Furniture Sales Co. v. Edward J. DeBartolo Corp.,* 249 Md. 540, 241 A.2d 126 (1968):

> In the case of words or conduct actionable *per se,* their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved. In the case of words or conduct actionable only *per quod,* the injurious effect must be established by allegations and proof of special damage and in such cases it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damage.

*Id.* at 544, 241 A.2d 126; *accord Metromedia, Inc. v. Hillman,* 285 Md. 161, 163–64, 400 A.2d 1117 (1979). Whether an alleged defamatory statement is *per se* or *per quod* is a question of law for the court. *Shapiro,* 105 Md.App. at 773, 661 A.2d 202; *Gooch,* 81 Md.App. at 391 n. 8, 567 A.2d 954.

"If the statement is *per quod,* then the jury must decide whether the statement does, in fact, carry defamatory meaning." *Shapiro,* 105 Md.App. at 773, 661 A.2d 202. But if the statement is defamatory *per se,* and the defendant was merely negligent in making the false statement, the plaintiff must still prove actual damages. *Hearst Corp.,* 297 Md. at 122, 466 A.2d 486; *Metromedia,* 285 Md. at 172, 400 A.2d 1117. In contrast, when a plaintiff establishes that a statement was defamatory *per se* and, by clear and convincing evidence, demonstrates that it was made with actual malice, a "presumption of harm to reputation ... arises from the publication of words actionable *per se.* A trier of fact is not constitutionally barred from awarding damages based on that presumption in [an actual] malice case." *Hanlon v. Davis,* 76 Md.App. 339, 356, 545 A.2d 72 (1988) (citation omitted). In other words, if the statement is defamatory *per se,* damages are presumed when a plaintiff can demonstrate actual malice, by clear and convincing evidence, even in the absence of proof

of harm. *Hearst*, 297 Md. at 125–26, 466 A.2d 486; *Shapiro*, 105 Md.App. at 774, 661 A.2d 202; *Laws v. Thompson*, 78 Md.App. 665, 685, 554 A.2d 1264, *cert. denied*, 316 Md. 428, 559 A.2d 791 (1989).

In regard to the statement that appellant's performance was poor, what we said in *Leese v. Baltimore County*, 64 Md.App. at 474, 497 A.2d 159, is pertinent:

> [I]t is defamatory "to utter any slander or false tale of another ... which may impair or hurt his trade or livelyhood [sic]." Thus, a statement "that adversely affects [an employee's] fitness for the proper conduct of his business ... [is] actionable *per se* at common law."
>
> This is not to imply, however, that every negative evaluation of an employee's performance is potentially defamatory. Rather, " '[t]he words must go so far as to impute to him some incapacity or lack of due qualification to fill the position.' " In other words, the defamatory statement must be such that "if true, would disqualify him or render him less fit properly to fulfill the duties incident to the special character assumed."

(Alterations in original) (citations omitted). We also find noteworthy the Court's comment in *Kilgour v. Evening Star Newspaper Co.*, 96 Md. 16, 23–24, 53 A. 716 (1902):

> Words spoken of a person in his office, trade, profession, business or means of getting a livelihood, which tend to expose him to the hazard of losing his office, or which charge him with fraud, indirect dealing or incapacity and thereby tend to injure him in his trade, profession or business, are actionable without proof of special damage, even though such words if spoken or written of an ordinary person, might be actionable *per se*.

█ Based on the record before us, construed in the light most favorable to appellant, Dr. Tschechtelin's alleged statement amounted to defamation *per se*. The Newspaper article was entitled "Firing of VP at Community College touches off demand for probe," and identified the "VP" as Dr. Samuels. An assertion that appellant was terminated because of inferior

performance on the job suggested that it was founded on fact and that appellant was incapable or unqualified to fulfill the obligations of a senior administrator at a community college. *See Leese,* 64 Md.App. at 474, 497 A.2d 159.

 As we noted, appellant claims that the defamatory statement was made with actual malice, because Dr. Tschechtelin knew it was false. In his brief, Dr. Samuels says: "If the jury accepts Dr. Samuels' [sic] contention that the alleged performance evaluation was made in bad faith and was pretextual, then President Tschechtelin's statement to the press was made with constitutional malice—he knew that it was false." Further, he contends that he presented evidence to show that President Tschechtelin was "motivated by animosity" and "not by a good faith assessment of Dr. Samuels' [sic] performance."

In opposition to summary judgment, appellant submitted an affidavit in which he said, in part:

39. .... I noted the continuing deterioration in our relationship. Tschechtelin became increasingly hostile and displayed increasing criticism over various administrative issues. At this time, it occurred to me that racism explained Tschechtelin's behavior. Tschechtelin did not become hostile towards me until it became obvious that I, as an African American, had more influence than he at a predominantly African–American institution. So long as I did not obviously display my abilities and so cast Tschechtelin into shadow, Tschechtelin was pleased with and complimentary about my contributions. After May, that all ended.

40. Racial issues have existed at BCCC during my tenure there. Documents produced by the African American Issues Committee ("AAIC") and the Office of Institutional Research indicate widespread racial dissatisfaction. For example, as Defendants' own documents verify, African–American[s] are disproportionately fired when compared to their white counterparts. Furthermore, even though BCCC is a predominantly African–American institution, the Administration never organized an institution-wide recognition

let alone celebration of African–American history month. Moreover, Tschechtelin allowed the Institute for Intercultural Understanding to languish through poor funding. As to the funding for the Institute for Intercultural Understanding, I actively searched out funding and obtained a $60,000 Beacon Grant from the American Association of Community Colleges. Furthermore, at the suggestion that BCCC was a "black institution," Tschechtelin displayed strong antagonism.

* * *

42. On October 4, 1994, Tschechtelin met with me and told me that we "were not on the same page" and that he wanted to make a change in Vice Presidents. Tschechtelin offered me the option of being fired or resigning. When I asked why, Tschechtelin declared that he did not have to tell me anything because "he is the president." Whereupon, I told Tschechtelin that his decision was not performance based but discriminatory.

Appellees quarrel with the adequacy of appellant's evidence as to actual malice. But, " 'disposition by summary judgment is generally inappropriate in cases involving motive or intent.' " *Clea v. Mayor of Baltimore, supra,* 312 Md. at 677, 541 A.2d 1303 (quoting *DiGrazia v. County Exec. for Montgomery County,* 288 Md. 437, 445, 418 A.2d 1191 (1980)); *see Brown v. Dermer,* 357 Md. 344, 355, 744 A.2d 47 (2000). Such issues are generally "reserved for resolution by the factfinder" when they are "essential elements of the plaintiff's case...." *Brown,* 357 Md. at 355, 744 A.2d 47.

Even if the statement was false, appellees challenge the adequacy of appellant's evidence as to damages. In the course of appellant's deposition, filed in opposition to summary judgment, appellant stated that, after termination, he applied to more than 100 institutions, but was unable to secure another position. Although appellant could not say whether the news article played a role in the decisions of any of those institutions, Dr. Samuels testified to one hearsay statement

that suggested the article prevented him from obtaining employment. In any event, appellees overlook that if Dr. Tschechtelin's statement was defamatory *per se and* was made with actual malice, it would have been unnecessary for appellant to prove harm at the summary judgment stage, because damages would have been presumed. *See Shapiro,* 105 Md. App. at 774, 661 A.2d 202.

Given the posture of the case on summary judgment, we are of the view that the evidence was sufficient to defeat summary judgment with respect to the question of whether Dr. Tschechtelin's statement was false and whether it was made with knowledge of its falsity. Based on what was before the trial court, the truth or falsity of the statement and the degree of Dr. Tschechtelin's fault, if any, are questions for a jury to resolve.

In reaching our conclusion as to the defamation claim, we addressed the issues raised by the parties and considered by the court in granting summary judgment. We are constrained to point out, however, that the parties devoted little time in their briefs to the defamation count. For example, appellees did not address whether Dr. Tschechtelin enjoyed a defense of privilege. Nor have the parties addressed whether the public had a right to know of the personnel actions taken by the College, including the reasons for such a course of action, in light of BCCC's status as a public institution. The parties also did not discuss the import, if any, of the Open Meetings Act. *See* S.G. §§ 10–501–10–512. In a footnote, appellees merely assert that Dr. Tschechtelin is immune from suit under the Maryland Tort Claims Act. *See* C.J. § 5–522(b) (stating, in part, that certain State personnel "are immune from suit in courts of the State and from liability in tort for a tortious act or omission that is within the scope of the public duties of the State personnel and is made without malice or gross negligence"). If Dr. Tschechtelin acted with actual malice, however, that statute may not apply.

Moreover, although truth is a defense to a defamation action, the parties did not address whether the truth or falsity

of "poor performance" is assessed subjectively, based on the personal standards and expectations of Dr. Tschechtelin, or objectively. To be sure, Dr. Samuels denies that his performance was poor. As we see it, however, the concept of "poor performance" does not lend itself to a mathematically precise definition, in much the same way that "[t]here is no single definition of what constitutes good cause for discharge." STANLEY MAZEROFF, MARYLAND EMPLOYMENT LAW § 3.3(a), at 189 (1990); *Cf. Shapiro,* 105 Md.App. at 760, 661 A.2d 202. Thus, whether conduct amounts to "poor performance" necessarily varies with the nature of the particular employment; what constitutes poor performance in the context of one position or for one employer may not amount to poor performance in a different employment situation. Moreover, it seems reasonable that a college president needs to be able to work effectively with his or her senior staff. *Cf. University of Baltimore v. Iz, supra,* 123 Md.App. at 165–66, 716 A.2d 1107 (1998) (recognizing that collegiality is a valid consideration for tenure review, but may not be used as pretext for discrimination). Thus, whether Dr. Samuels and Dr. Tschechtelin were compatible may have been a valid factor in Dr. Tschechtelin's assessment of Dr. Samuels's performance. *Cf. Dorrance v. Hoopes,* 122 Md. 344, 350, 90 A. 92 (1914); *Shapiro,* 105 Md.App. at 760, 661 A.2d 202.

These unanswered questions suggest that the parties should consider, *inter alia,* whether the statement was "false" under the law of defamation if Dr. Tschechtelin truly believed that Dr. Samuels's performance was poor, even if another college president might have been satisfied. They should also consider whether the status of BCCC as a public institution has any bearing on the defamation claim. Because these issues were never raised, we express no opinion as to them.

### D. Section 1983—Count VII

Appellant contends that the circuit court erred in entering summary judgment in favor of Dr. Tschechtelin and the individual Trustees on his federal § 1983 action. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any ... person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983; *see UAW v. Gaston Festivals, Inc.,* 43 F.3d 902, 906 (4th Cir.1995) ("Liability under section 1983 only extends to persons acting under color of law, a requirement equivalent to that of state action under the Fourteenth Amendment.").

Because a § 1983 claim " 'is not itself a source of substantive rights,' " but instead " 'a method for vindicating federal rights elsewhere conferred,' " *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)), an individual may seek redress of an alleged violation of the Fourteenth Amendment through an action pursuant to § 1983. *See Hafer v. Melo,* 502 U.S. 21, 28, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("Congress enacted § 1983 ' "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." ' " (citations omitted)); *Dennis v. Higgins,* 498 U.S. 439, 444–45, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (stating that "the 'prime focus' of § 1983 and related provisions was to ensure 'a right of action to enforce the protections of the Fourteenth Amendment and the federal laws enacted pursuant thereto' " (citation omitted)); 14 C.J.S. *Civil Rights* § 6, at 495 (1991) (acknowledging that § 1983 "is designed to provide a federal remedy for the deprivation of constitutional rights or federally guaranteed rights").

▆▆ Appellant does not challenge the court's dismissal of his § 1983 claims against the State and the Board. "[N]either a state nor a state agency nor a state official *sued in his official capacity* is a 'person' within the meaning of § 1983."

*Ritchie v. Donnelly, supra,* 324 Md. at 355, 597 A.2d 432 (emphasis in original); *see Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Manikhi v. Mass Transit Admin.,* 360 Md. 333, 360–61, 758 A.2d 95 (2000). Consequently, a plaintiff cannot maintain a § 1983 action against a state, a state agency, or a state official for money damages. *Manikhi,* 360 Md. at 361, 758 A.2d 95; *Ritchie,* 324 Md. at 355, 597 A.2d 432; *but see Okwa,* 360 Md. at 193 n. 16, 757 A.2d 118 ("An action for *injunctive* relief brought pursuant to § 1983 may be maintained against a state official or state employee regardless of which capacity the state official or employees [sic] is sued." (emphasis added)). The foregoing tenets also bar an action against Dr. Tschechtelin and the Trustees in their official capacities under § 1983.

Nevertheless, a state official may be sued in his or her individual capacity on the basis of official acts under § 1983. *See Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Okwa,* 360 Md. at 193, 757 A.2d 118; *Ashton v. Brown,* 339 Md. 70, 112, 660 A.2d 447 (1995); *Ritchie,* 324 Md. at 355, 597 A.2d 432. As the Court of Appeals explained in *DiPino v. Davis,* 354 Md. 18, 46, 729 A.2d 354 (1999):

A personal-capacity action seeks to establish personal liability on the part of the official for conduct committed under color of State law that causes the deprivation of a Federal right. If available under the facts of the case, the official may assert the good faith immunity defense set forth in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), *i.e.,* an objectively reasonable reliance on existing law.[14] Because it is the personal conduct of the official that is alleged to be wrongful, rather than any

14. Absolute immunity has been extended to "officials whose special functions or constitutional status requires complete protection from suit," i.e., legislators, judges, prosecutors, executive officers engaged in adjudicative functions, and the President of the United States. *Harlow,* 457 U.S. at 807, 102 S.Ct. 2727; *see Ritchie,* 324 Md. at 360, 597 A.2d 432. "For executive officials in general, however, ... qualified immunity represents the norm." *Harlow,* 457 U.S. at 807, 102 S.Ct. 2727.

governmental policy or custom, punitive damages are permissible in a personal-capacity action, but the plaintiff may look only to the personal assets of the official, and not to the entity, for the recovery of any damage award.

Expounding upon the rationale underlying the good faith or qualified immunity available to state officials, the Supreme Court stated in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987):

[P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties. Our cases have accommodated these conflicting concerns by generally providing government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken.

The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging

violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 638–40, 107 S.Ct. 3034 (alteration in original) (citations omitted) (footnote omitted); *see Okwa,* 360 Md. at 198–200, 757 A.2d 118; *see also Ritchie,* 324 Md. at 360–61, 597 A.2d 432 (indicating that qualified immunity "varies with 'the scope of the discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action.'" (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 247, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974))).

As we explained, § 1983 does not itself create a substantive right, but instead provides a method by which a party may obtain redress for violations of federally created rights. *See Albright,* 510 U.S. at 271, 114 S.Ct. 807 (1994); *Campbell,* 133 Md.App. at 534–35, 758 A.2d 616; *Nicholson Air Servs., Inc. v. Board of County Comm'rs,* 120 Md.App. 47, 83, 706 A.2d 124 (1998). Therefore, we must "identify the specific constitutional right allegedly infringed" in the present case. *Albright,* 510 U.S. at 271, 114 S.Ct. 807.

For reasons identical to those discussed in § II A, appellant contends that Dr. Tschechtelin and the Trustees infringed his constitutionally protected property and liberty interests, in

violation of the substantive and procedural due process protections contained in the Due Process Clause. *See Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (making clear that Fourteenth Amendment procedural and substantive due process violations are actionable under § 1983). Appellant suggests that he had a contractually derived property interest in his employment that entitled him to due process. He also maintains that the publication of the statements Dr. Tschechtelin made to the Newspaper effected a deprivation of his liberty interest, in violation of the Due Process Clause. Thus, we are again confronted with the four possible "categories" of due process claims outlined earlier, which we restate for clarity: (1) a procedural due process claim premised on the deprivation of a property interest; (2) a procedural due process claim premised on the deprivation of a liberty interest; (3) a substantive due process claim premised on the deprivation of a property interest; and (4) a substantive due process claim premised on the deprivation of a liberty interest.

Preliminarily, we conclude that the development of the record after the resolution of appellees' motion to dismiss does not affect the reasoning that disposed of three of the four categories of due process claims brought under Article 24. Because our courts have equated Article 24 and the Due Process Clause, *see Comm'n on Med. Discipline v. Stillman, supra,* 291 Md. at 414 n. 9, 435 A.2d 747, we rely on our reasoning in § II A, and offer the following holdings in connection with the present issue. First, we conclude that no liberty interest was implicated in this case that might require substantive and procedural due process protections under the Fourteenth Amendment. Second, appellant's supposed contract-based property interest in his employment does not amount to a fundamental right for purposes of Fourteenth Amendment substantive due process. Third, there is no basis for a § 1983 claim against the Trustees, for reasons articulated in § II A.

■ Thus, the only federal due process claim requiring further consideration is that alleging deprivation of a property interest, in violation of procedural due process by Dr. Tschechtelin. Relying on the Employment Contract, its renewal for two terms, and the Revised Policy, appellant argues that he had a protected property interest in employment. We set out the following excerpt from appellant's brief in an effort to clarify his position:

[T]he defendants have asserted that in late January of 1992, the Board of Trustees adopted [the Revised Policy] under which the renewable one year contracts were replaced with letters of appointment which provided that administrators and staff "serve[d] at the pleasure of the President and the Board of Trustees." That fact alone, however, is not determinative under the other circumstances of the case.

[The Revised Policy] was not implemented until after Dr. Samuels had already accepted his appointment. The College in fact sent the renewable one year [Employment C]ontract to Dr. Samuels. That form contract provided that Dr. Samuels could be terminated "for cause" or for "financial exigency." The Board of Trustees did not take any action at its December [21,[15] 1994] meeting. Subsequently, President Tschechtelin sent the January 17[, 1995] letter which asserted that he was recommending a performance based termination. In discharging Dr. Samuels, the College did not simply end the employment relationship with no stated reason; rather, it attempted to comply with the [Revised Policy] in an effort to perfect a "for cause" termination.

These facts support a finding that, under the circumstances of this case, Dr. Samuels could be terminated only "for cause." As such, he was not purely an at-will employee. Further, having elected to invoke [the Revised Policy], the College was required to abide by the obligations imposed by it.

---

**15.** Without reference to the year, appellant's brief erroneously provides a date of December 18.

* * *

In this case, through the [Revised Policy], the parties' employment contract [sic] added specific limitations and conditions on the College's right to terminate Dr. Samuels' employment. If his performance was "fair," he could be terminated for performance related reasons only if the College gave him the specified opportunity for improvement. If his performance was better than "fair," the College would not be able to discharge him for performance related reasons.

The [Revised Policy] clearly set forth a requirement for a substantive determination. That substantive determination, in turn, carried with it an obligation that the College's discretion be exercised in good faith. Accordingly ..., the College could not use [the Revised Policy] as a pretext. (Citation to record extract omitted).

Appellees respond that Dr. Samuels had no property interest in his employment. They aver that the Letter of Appointment is the only document executed by a State official in this regard, and it made Dr. Samuels an at-will employee. Additionally, in support of their contention, appellees refer to the provision in the Revised Policy that reads: "The appointments will have no end date; administrators and professional staff will serve at the pleasure of the President and the Board of Trustees." Appellees assert that the evaluation procedures contained in the Revised Policy did not alter appellant's at-will status. As to the Employment Contract contained in the Record, appellees point out that appellant would have received it after he accepted his appointment. Moreover, they suggest that, because it was unsigned, it is not a valid contract under State law.

As we discussed in § II A, resolution of this issue necessarily turns on a fact finder's determination of the employment status of appellant. As evidenced by the parties' arguments, there appears to be an inherent conflict between the Revised Policy and the Employment Contract (assuming it was a valid contract and was renewed). The Revised Policy expressly

states that administrators will serve at the pleasure of the Board. Whether the evaluation procedures are mandatory, and whether they create an at-will employment agreement, are not before us. The Employment Contract, on the other hand, clearly sets out a termination date. If, as appellant suggests, the Employment Contract was renewed for the 1994/1995 term, it is likely that the term expired February 2, 1993, after Dr. Samuels received the letter of termination, but nearly a month before the termination became effective. Nevertheless, if amended by the Revised Policy, perhaps appellant could not be terminated without evaluation by the Board.

For these reasons, we shall vacate the award of summary judgment as to Count VII insofar as it states a property interest-based procedural due process claim against Dr. Tschechtelin. A fuller factual record will allow for the determination of whether Dr. Tschechtelin is entitled to good faith immunity.

**DISMISSAL OF COUNT III VACATED AS TO DR. TSCHECHTELIN; SUMMARY JUDGMENT IN FAVOR OF DR. TSCHECHTELIN AS TO COUNT V VACATED; SUMMARY JUDGMENT IN FAVOR OF DR. TSCHECHTELIN AS TO COUNT VII VACATED. ALL OTHER JUDGMENTS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND DR. TSCHECHTELIN.**